**UNITED STATES OF AMERICA**

v.

**Louise MANGO, Kenneth Austin, Kevin Dominske, and Phenix Environmental, Inc., Defendants.**

**No. 96–CR–327.**

United States District Court, N.D. New York.

March 5, 1998.

Thomas J. Maroney, United States Attorney for the Northern District of New York, Syracuse, NY, of counsel: Craig A. Benedict, Edward R. Broton, Asst. U.S. Attorneys.

Miller, Cassidy, Larroca, and Lewin, L.L.P., Washington, D.C., for Defendants Louise Mango and Phenix Environmental, Inc., of counsel: R. Stan Mortenson, Jay L. Alexander, James R. Heavner, Jody Manier Kris.

Lynn Law Office, Syracuse, NY, for Defendants Louise Mango and Phenix Environmental, Inc., of counsel: Thomas F. Shannon.

Sidley & Austin, Washington, D.C., for Defendant Kenneth Austin, of counsel: John N. Gallo, Bradford A. Berenson, Stephen B. Kinnaird, Eric S. Mattson.

Hiscock & Barclay, L.L.P., Syracuse, NY, for Defendant Kenneth Austin, of counsel: Robert A. Barrer.

Stillman & Friedman, New York, NY, for Defendant Kevin Dominske Michael Grudberg, of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

### INTRODUCTION

Presently before the court are four motions which defendants have filed. Each of these motions seeks to dismiss certain counts of the Indictment. The first motion seeks to dismiss Counts 2–31 for unlawful delegation of permitting authority. The second seeks to dismiss Counts 14–19. The third seeks to dismiss Counts 2–13 and 26–31 for lack of authority to enforce criminally the provisions of Appendices C and D to the Final Environmental Impact Statement ("FEIS"). Finally, the fourth motion seeks to dismiss Counts 2–13 and 20–31 as beyond the substantive regulatory authority of the Corps of Engineers under § 404 of the Clean Water Act, 33 U.S.C. § 1344 ("CWA"). The government opposes these motions in their entirety.

On January 22 and 23, 1998, the court heard oral argument in support of, and in opposition to, these motions and reserved decision. The following constitutes the court's resolution of these motions.

### I. Motion to Dismiss Counts 2–31 of the Indictment for Unlawful Delegation of Permitting Authority

#### A. Introduction

■ Defendants move to dismiss Counts 2–31 of the Indictment on the grounds that the Permit issued to Iroquois ("Iroquois Permit") was issued by a District Engineer who lacked statutory authority under the CWA to issue such permits.[1] The government opposes this motion, asserting that the Secretary of the Army promulgated regulations in compliance with the Administrative Procedures Act ("APA") which authorized the Chief of

---

1. The type of permit at issue is commonly referred to as a "§ 404 permit" because it is issued pursuant to § 1344 of Title 33 of the United States Code. Section 1344 is also commonly referred to as a § 404. Throughout this Memorandum–Decision and Order, the court will refer to such permits and the statute under which they are issued by this common designation.

Engineers to delegate to the District Engineers his statutory authority to issue or deny § 404 permits for the discharge of dredged or fill material into the navigable waters of the United States at specified disposal sites.

## B. Analysis

Resolution of this motion turns on the issue of whether in enacting § 404 of the CWA Congress intended to permit the Chief of Engineers to subdelegate his statutory authority to issue permits for the discharge of dredged or fill material into the navigable waters of the United States to his District Engineers. Defendants contend that § 404 unambiguously and specifically provides for the Secretary of the Army ("the Secretary") to delegate his authority to issue § 404 permits only to the Chief of Engineers and that, therefore, no further delegation is permitted. To the contrary, the government argues that because § 404 does not specifically proscribe subdelegation of the Secretary's authority to issue § 404 permits, Congress intended that the Chief of Engineers could subdelegate this authority to his District Engineers.

Pursuant to the familiar two-step analysis in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), a court called upon to review an agency's construction of a statute it administers is confronted with two questions. "First, always, is the question whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781. As the Court stated in *Chevron*, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781 (footnote omitted).

If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, ... Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 843, 104 S.Ct. at 2781–82 (footnote omitted).

With the *Chevron* test as a guide, the court will address the parties' arguments with respect to the meaning of § 404. As the court is required to do, it will begin its inquiry with the language of the statute itself.

There are two paragraphs of § 404 that are relevant to the court's determination of whom Congress authorized to issue § 404 permits. First, § 404(a) specifically grants the authority to issue permits for the discharge of dredged or fill material to the Secretary. 33 U.S.C. § 1344(a) ("The Secretary may issue permits ... for the discharge of dredged or fill material into the navigable waters at specified disposal sites."). Second, § 404(d) defines the term "Secretary" to mean "[t]he Secretary of the Army, acting through the Chief of Engineers." 33 U.S.C. § 1344(d). Based upon this language, defendants argue that Congress expressly vested the authority to issue § 404 permits in the Secretary of the Army or his statutorily-identified delegee, the Chief of Engineers. It therefore follows, according to defendants, that because § 1319(c) punishes violations of "[a]ny requirement ... in a **permit issued** under section 1344 of this title by the **Secretary of the Army** ...", 33 U.S.C. § 1319(c)(2)(A) (1986 & 1997 Supp.) (emphasis added), they may not be punished for violating a requirement of the Iroquois Permit which was issued by the New York District Engineer, rather than the Chief of Engineers.

The government readily concedes that the Iroquois Permit was issued by the New York District Engineer.[2] However, it argues that this fact does not preclude the criminal prosecution of defendants for allegedly violating this permit because the Chief of Engineers and his necessary representatives are authorized to issue such permits on behalf of the Secretary pursuant to regulations which the Corps promulgated in strict compliance with the APA. *See* 33 C.F.R. § 325.8(a) ("Except

---

**2.** Actually the Iroquois Permit was issued over the signature of Lt. Col. Boston, acting on behalf of Col. Danielson, the New York District Engi-

neer. *See* Defendants' Memorandum of Law in Support of Motion to Dismiss Counts 2–13 and 20–31, Exhibit 3 attached thereto, at 3.

as otherwise provided in this regulation, the Secretary of the Army, ..., has authorized the Chief of Engineers and his authorized representatives to issue or deny permits ... for the discharge of dredged or fill material into waters of the United States pursuant to section 404 of the Clean Water Act; ..."); 33 C.F.R. § 325.8(b) ("District Engineers are authorized to issue or deny permits in accordance with these regulations pursuant to ... section 404 of the Clean Water Act; ...").

Even a cursory reading of § 404 establishes that this statute clearly authorizes only the Secretary acting through the Chief of Engineers to issue permits for the discharge of dredged or fill material into the navigable waters of the United States. However, it is also clear that this statute does not explicitly proscribe the subdelegation of this authority by the Chief of Engineers to his District Engineers.

In support of their argument that the Chief of Engineers may not subdelegate his § 404 permitting authority, given Congress' explicit designation of the Chief of Engineers as the Secretary's delegee, defendants rely upon the Supreme Court's decisions in *Cudahy Packing Co. of Louisiana v. Holland,* 315 U.S. 357, 62 S.Ct. 651, 86 L.Ed. 895 (1942), and *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), as well as the recent decisions of the Second and District of Columbia Circuits. *See United States v. Workman,* 110 F.3d 915 (2d Cir.1997); *Halverson v. Slater,* 129 F.3d 180 (D.C.Cir.1997).[3]

The issue in *Cudahy Packing* was whether under the Fair Labor Standards Act ("FLSA"), the Administrator of the Wage and Hour Division of the Department of Labor had the authority to delegate his statutory power to sign and issue subpoenas duces tecum. The FLSA itself did not define the Administrator's power to issue subpoenas nor did it specifically authorize him to delegate this power to others. However, § 9 of the FLSA gave the Administrator "[a]ll the powers with respect to subpoenas which are conferred upon the Federal Trade Commission, [by the Federal Trade Commission Act] and no more." *Id.* at 360, 62 S.Ct. at 653. The Trade Commission Act permitted, *inter alia,* the Commission to require the production of documents by subpoena and provided that any member of the Commission could sign the subpoenas. *See id.*

In *Cudahy Packing,* the Administrator argued that § 4(c) of the FLSA gave him the authority to delegate to regional directors the signing and issuance of subpoenas. *Id.* at 360, 62 S.Ct. at 653. Section 4(c) provided that "[t]he principal office of the Administrator shall be in the District of Columbia, but he or his duly authorized representative may exercise any or all of his powers in any place." *See id.* The Court rejected this argument, stating that "[a] construction of the [FLSA] which would thus permit the Administrator to delegate all his duties, including those involving administrative judgment and discretion which the [FLSA] has in terms given only to him, can hardly be accepted unless plainly required by its words." *Id.* at 361, 62 S.Ct. at 654. The Court went on to explain that "[t]he words of ... section [4], read in their statutory setting, make it reasonably plain that its only function is to provide that the Administrator and his representatives may exercise either within or without the District of Columbia such powers as each possesses." *Id.* at 361–62, 62 S.Ct. at 654.

---

**3.** Defendants' reliance upon *Workman,* although not entirely misplaced, presents a set of circumstances which clearly are distinguishable from those at issue here and, therefore, *Workman* does little, if anything, to buttress their position. The most significant difference between these cases is that *Workman* addresses the issue of "interbranch" or "peer-to-peer" delegation while this case presents the issue of "intra-agency" or "supervisor-to-subordinate" delegation.

There is, however, one similarity between the statute at issue in *Workman* and § 404. In both statutes, Congress specifically designated the particular official or entity which it intended to perform a particular function. In other words, 18 U.S.C. § 3572(d) authorizes the court to schedule the installment payments of fines, not the Bureau of Prisons to which the court attempted to delegate this authority. Likewise, § 404 authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue permits for the discharge of dredged or fill material into navigable waters, not the District Engineers to whom, the government argues, the Chief of Engineers validly delegated his authority.

Alternatively, the Administrator argued that his authority to delegate his subpoena power should be inferred from the nature of his duties and from the fact that under § 11 of the FLSA he could, through designated representatives, gather data and make investigations authorized by the FLSA. *See id.* at 363, 62 S.Ct. at 654. The Court also rejected this argument, finding that "[t]his argument loses force when examined in the light of related provisions of the [FLSA] and of the actual course of Congressional legislation in this field." *Id.* at 363, 62 S.Ct. at 655. The Court explained that "[t]he grant of authority to delegate the power of inspection and the omission of authority to delegate the subpoena power shows a legislative intention to withhold the latter." *Id.* at 364, 62 S.Ct. at 655. The Court also stated that "[t]he entire history of the legislation controlling the use of subpoenas by administrative officers indicates a Congressional purpose not to authorize by implication the delegation of the subpoena power." *Id.* at 364, 62 S.Ct. at 655. Moreover, the Court recognized that "[C]ongress, in numerous cases, has specifically authorized delegation of the subpoena power ... or [i]t has granted the power to particularly designated subordinate officers or agents, thus negativing any implied power in the head to delegate generally to subordinates." *Id.* at 365, 62 S.Ct. at 655–56 (footnotes omitted). Finally, the Court noted that the authority to delegate the subpoena power had been eliminated by the Conference Committee from the bills each House had adopted. *See id.* at 366, 62 S.Ct. at 656.

Based upon this review of the FLSA itself as well as its legislative history, the Court held that

[e]ven though Congress has underestimated the burden which it has placed upon the Administrator, which is by no means clear, we think that the legislative record establishes that Congress has withheld from him authority to delegate the exercise of the subpoena power, and that this precludes our restoring it by construction.

*Id.* at 367, 62 S.Ct. at 656–57.

Some thirty years later, the Supreme Court once again addressed the delegation of statutory authority in *Giordano.* In that case, the Court was called upon to interpret Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, which prescribes the procedure for securing judicial authority to intercept wire communications in the investigation of specified serious offenses. In particular, the Court had to decide whether the provision of 18 U.S.C. § 2516(1) which conferred power upon the

"Attorney General, or any Assistant Attorney General specifically designated by the Attorney General" to "authorize an application to a Federal judge ... for ... an order authorizing or approving the interception of wire or oral communications" by federal investigative agencies seeking evidence of certain designated offenses permits the Attorney General's Executive Assistant to validly authorize a wiretap application to be made.

*Id.* at 507–08, 94 S.Ct. at 1823.

On appeal, the government argued that the authorization of intercept applications by the Attorney General's Executive Assistant was not inconsistent with § 2516(1) and that, even if it were, there was no constitutional violation and therefore the district court should not have ordered the wiretap and derivative evidence suppressed.

The Court disagreed with both these contentions. Turning to the language of the statute to determine if it permitted the authorization of wiretap applications by the Attorney General's Executive Assistant, the Court found that "[p]lainly enough, the Executive Assistant is neither the Attorney General nor a specially designated Assistant Attorney General; ..." *Id.* at 513, 94 S.Ct. at 1825.

Nevertheless, despite the unambiguous language of § 2516(1) with regard to those who could authorize an intercept application, the government urged that 28 U.S.C. § 509

[v]ests all functions of the Department of Justice, with some exceptions, in the Attorney General, and that Congress characteristically assigns newly created duties to the Attorney General rather than to the Department of Justice, thus making essential the provision for delegation appearing in

28 U.S.C. § 510: "The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General."

*Id.* at 513, 94 S.Ct. at 1825–26.

Based upon this language, the government argued that "[m]erely vesting a duty in the Attorney General, ... evinces no intention whatsoever to preclude delegation to other officers in the Department of Justice, including those on the Attorney General's own staff." *Id.* at 513, 94 S.Ct. at 1826.

The Court noted that as a general proposition the government's argument was not exceptional. However, it found the case *sub judice* to be distinguishable because "[t]he matter of delegation is expressly addressed by § 2516, and the power of the Attorney General in this respect is specifically limited to delegating his authority to 'any Assistant Attorney General specially designated by the Attorney General.'" *Id.* at 514, 94 S.Ct. at 1826. Although in reaching this conclusion the Court conceded that precise language forbidding delegation was not used in § 2516, as it was in other statutes,[4] it nonetheless concluded that " § 2516(1), fairly read, was intended to limit the power to authorize wiretap applications to the Attorney General himself and to any Assistant Attorney General he might designate." *Id.* at 514, 94 S.Ct. at 1826.

The Court went on to explain that its interpretation of the statute was strongly supported by its purpose and legislative history. *See id.* at 514, 94 S.Ct. at 1826. Looking at that legislative history, the Court noted that at hearings on the bill which eventually became § 2516 the Assistant Attorneys General in charge of the Criminal Division of the Department of Justice stated the Department's view that the authority to approve applications should be limited so that the Attorney General could delegate his authority only to an Assistant Attorney General. *See id.* at 516, 94 S.Ct. at 1827. In addition, the Court found the Senate Judiciary Committee's report on the bill particularly significant because "[i]t not only recognizes that the authority to apply for court orders is to be narrowly confined but also declares that it is to be limited to those responsive to the political process, a category to which the Executive Assistant to the Attorney General obviously does not belong." *Id.* at 520, 94 S.Ct. at 1829 (footnote omitted).

Moreover, the Court found that during the proceedings leading to the passage of the Senate bill, emphasis was placed on § 2516. The Court noted that during these discussions, "[i]t was made clear that as the bill was drafted no United States Attorney would have or could be given the authority to apply for an intercept order without the advance approval of a senior officer in the Department." *Id.* at 521, 94 S.Ct. at 1829 (footnote omitted). Finally, the Court determined that "[t]here was no congressional attempt, ..., to extend that authority beyond the Attorney General or his Assistant Attorney General designate." *Id.* at 522, 94 S.Ct. at 1829–30. Based upon its review of this legislative history, the Court concluded that "[i]t appears wholly at odds with the scheme and history of the Act to construe § 2516(1) to permit the Attorney General to delegate his authority at will, whether it be to his Executive Assistant or to any officer in the Department other than an Assistant Attorney General." *Id.* at 523, 94 S.Ct. at 1830 (footnote omitted).

The government attempts to distinguish *Cudahy Packing* and *Giordano* on the ground that in both of those cases the Supreme Court concluded that Congress clearly expressed an intent that no delegation by the agency be permitted. Unlike those cases, the government asserts that the legislative history of the CWA makes clear that Congress contemplated that the Chief of Engineers would administer the § 404 permit program on behalf of the Corps in an efficient and effective manner, thus indicating

---

4. As an example the Court cited the Civil Rights Act of 1968, particularly 18 U.S.C. § 245(a)(1), which authorizes certain prosecutions only upon the certification of the Attorney General or the Deputy Attorney General " 'which function of certification may not be delegated.' " *Id.* 416 U.S. at 514, 94 S.Ct. at 1826 (quoting 18 U.S.C. § 245(a)(1)).

that Congress intended to permit him to subdelegate his § 404 permitting authority to the District Engineers if such delegation would serve this purpose.

In support of this proposition, the government relies upon *Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947), and *Rodriguez v. Compass Shipping Co. Ltd.*, 617 F.2d 955 (2d Cir.1980), *aff'd on other grounds*, 451 U.S. 596, 101 S.Ct. 1945, 68 L.Ed.2d 472 (1981). In *Fleming*, the Court addressed the question of whether the Emergency Price Control Act ("the Act") authorized the Administrator to delegate his authority to sign and issue subpoenas to the district directors. Section 201(a) of the Act provides, in pertinent part, that " '[t]he Administrator, may subject to the civil-service laws, appoint such employees as he deems necessary in order to carry out his functions and duties under this Act, and shall fix their compensation in accordance with the Classification Act of 1923, as amended.' " *Id.* at 120, 67 S.Ct. at 1134 (quoting § 201 of the Emergency Price Control Act). Furthermore, § 201(b) of the Act provides that " '[t]he principal office of the Administrator shall be in the District of Columbia, but he or any duly authorized representative may exercise any or all of his powers in any place.' " *Id.* (quoting § 201(b) of the Emergency Price Control Act).

The Court began its analysis by recognizing that in *Cudahy Packing* it had held that a provision identical to § 201(b) did not authorize the Administrator to delegate his power to sign and issue subpoenas. Nevertheless, it found that *Cudahy Packing* did not control the case *sub judice*. The Court reached this conclusion based upon the differences in the legislative histories of the two Acts. First of all, it noted that the legislative history of the FLSA demonstrated that a provision granting authority to delegate the subpoena power had been eliminated when the bill was in Conference. *See id.* at 120, 67 S.Ct. at 1134. To the contrary, in reporting the bill that became the Emergency Price Control Act, the Senate Committee described § 201(a) as authorizing the Administrator to " 'perform his duties through such employees or agencies by delegating to them any of the powers given to him by the bill[,]' " and the Committee stated that § 201(b) authorized the Administrator or " 'any representative or other agency to whom he may delegate any or all of his powers, to exercise such powers in any place.' " *Id.* at 120–21, 67 S.Ct. at 1134 (quoting S.Rep. No. 931, 77th Cong., 2d Sess., pp. 20, 21).

Moreover, the Court pointed out that in *Cudahy Packing*, "[t]he [FLSA] made expressly delegable the power to gather data and make investigations, thus lending support to the view that when Congress desired to give authority to delegate, it said so explicitly." *Id.* at 121, 67 S.Ct. at 1134. To the contrary, the Court found that "[i]n the present Act, there is no provision which specifically authorizes delegation as to a particular function." *Id.* at 121, 67 S.Ct. at 1134. The Court also noted that the FLSA made applicable to the powers and duties of the Administrator the subpoena provisions of the Federal Trade Commission Act which only authorized either the Commission or its individual members to sign subpoenas, whereas "[t]he subpoena power under the present Act is found in § 202(b) and is not dependent on the provision of another Act having a history of its own." *Id.* at 121, 67 S.Ct. at 1134.

Finally, the Court distinguished the FLSA from the Emergency Price Control Act on the grounds that although the former granted no broad rule-making power, the latter provided that " '[t]he Administrator may, from time to time, issue such regulations and orders as he may deem necessary or proper in order to carry out the purposes and provisions of this Act.' " *Id.* at 121, 67 S.Ct. at 1134 (quoting § 201(d) of the Emergency Price Control Act). The Court explained further that "[s]uch a rule-making power may itself be an adequate source of authority to delegate a particular function, unless by express provision of the Act or by implication it has been withheld." *Id.* at 121, 67 S.Ct. at 1134 (citation omitted). The Court found that no provision in the Emergency Price Control Act negated the existence of such rule-making authority so far as the subpoena power was concerned nor could the absence of such authority be fairly inferred from the history and content of the Act. Therefore, the

Court held that "[t]he presence of the rule-making power, together with the other factors differentiating this case from the Cudahy case, indicates that the authority granted by § 201(a) and (b) should not be read restrictively." *Id.* at 122, 67 S.Ct. at 1134.

In the other case upon which the government relies, the Second Circuit was called upon to interpret § 33(b) of the Longshoremen's and Harbor Workers' Compensation Act ("the Act"). This statute provides that

(b) Acceptance of (statutorily fixed) compensation under an award in a compensation order filed by the deputy commissioner or (Benefits Review) Board shall operate as an assignment to the employer of all right of the person entitled to compensation to recover damages against such third person unless such person shall commence an action against such third person within six months after such award.

*Rodriguez,* 617 F.2d at 956 (quoting 33 U.S.C. § 933(b)). The plaintiff in *Rodriguez* contended that because his claim under the Act was not the subject of a formal compensation order filed by the deputy commissioner or the Board no assignment occurred and therefore his action was neither precluded nor time-barred. *See id.*

The facts in *Rodriguez* were as follows. After sustaining an injury while unloading a ship, the plaintiff, pursuant to § 5(b) of the Act, filed a workmen's compensation claim against his employer with the Office of Workers' Compensation Programs ("OWCP"), United States Department of Labor. Under regulations implementing the Act, a claims examiner employed by the Department of Labor convened an informal conference. At the conference, the plaintiff and his employer reached an agreement settling the claim which was memorialized in a written agreement dated November 4, 1974, on an OWCP form regularly used for that purpose. Title 20 C.F.R. § 702.315 requires the employer to commence paying the compensation benefits immediately without regard to whether the deputy commissioner, acting personally or through his designee, has filed a formal compensation order. Although he was required to do so, neither the deputy commissioner nor his designee ever filed or mailed a formal compensation order.

The Second Circuit first addressed the question of whether the settlement agreement amounted legally to an "award in a compensation order" of the deputy commissioner or Workmen's Compensation Board within the meaning of § 33(b). Although the plaintiff argued that the award must be approved by the deputy commissioner and that a claims examiner would not suffice, the court disagreed.

The court began its analysis by looking at § 39(a) of the Act which empowered the Secretary of Labor to make such rules and regulations " 'as may be necessary in the administration of this chapter.' " *Id.* at 958 (quoting 33 U.S.C. § 939(a)). In addition to noting that almost identical language had been construed by the Supreme Court in *Fleming* to permit an official to delegate duties, the Second Circuit found that "[i]t is generally accepted in this day and age that a governmental administrator vested with such authority may delegate unless expressly forbidden by statute or by the inconsistency of such a delegation with the purposes of the statute." *Id.* at 958 (citation omitted). The court reasoned that without such power directors or deputy directors of large divisions of government departments would be hampered in the performance of their duties. *See id.* Moreover, based upon its finding that "[n]othing in the history of the statute indicates that Congress' purpose was to insure the exercise of the personal discretion of the deputy commissioner as distinguished from that of a duly qualified designee[,]" the court held that "[u]nder the regulations in effect at the relevant time, an agreement settling an injured employee's claim to workmen's compensation, signed after an informal conference with a claims examiner, by whom it was approved, constitutes an 'award' within the meaning of § 33(b)." *Id.* at 959 (footnote omitted).

Despite the government's argument to the contrary, neither *Rodriguez* or *Fleming* is dispositive of the present case. Both of those cases involved statutes which were silent on the issue of delegation and both statutes included a general rule-making pro-

vision. To the contrary, § 404 specifically identifies the official to whom the Secretary may delegate his permit issuing authority: "[t]he Secretary of the Army acting through the Chief of Engineers." 33 U.S.C. § 1344(d). Moreover, the CWA does not contain a general rule-making provision upon which the Secretary may rely to delegate, or further subdelegate, his authority to issue § 404 permits to the District Engineers.

The government attempts to overcome the CWA's lack of a general rule-making provision by relying upon 10 U.S.C. § 3013(g)(3) which is almost identical to the provision relied upon by the Court in *Fleming* to distinguish that case from *Cudahy Packing.* Section 3013(g)(3) provides that the Secretary of the Army may "prescribe regulations to carry out his functions, powers, and duties under this title." 10 U.S.C. § 3013(g)(3) (1959 & 1997 Supp.). The problem with the government's reliance upon § 3013(g), however, is that by its very terms this provision limits its reach to the Secretary's functions, powers and duties under Title 10. There is nothing in § 3013(g) which suggests that Congress intended this provision to apply to any functions, powers, or duties the Secretary might have under any other Title, including Title 33. The government's argument is compromised further by § 3013(f) which specifically limits the delegation power of the Secretary to the Under Secretary of the Army and to the Assistant Secretaries of the Army. 10 U.S.C. § 3013(f) (1959 & 1997 Supp.).

In addition, as defendants point out, when Congress grants the power to delegate to the Secretary outside of Title 10, it typically provides for the specific subdelegation authority it intends the Secretary to have. For example, § 578(d) of Title 33 provides that "[t]he Secretary of the Army may delegate any authority conferred upon him by this section to any officer or employee of the Department of the Army. Any such officer or employee shall exercise the authority so delegated under rules and regulations approved by the Secretary." 33 U.S.C. § 578(d); *see also* 16 U.S.C. § 460i (identical language). These statutes further support the conclusion that Congress knows how to authorize delegation by the Secretary of the Army if that is, in fact, its intention.

*Joseph G. Moretti, Inc. v. Hoffman,* 526 F.2d 1311 (5th Cir.1976), upon which the government relies for the proposition that ordinarily Congress intends the duties delegated to the Secretary to be subdelegable does not require a different result. In that case, the Secretary of the Army, relying upon 10 U.S.C. § 3012 which permitted him to assign, detail, and prescribe the duties of members of the Army, had authorized " 'the Chief of Engineers and his authorized representatives to issue or deny permits for construction or other work affecting navigable waters of the United States.' " *Id.* at 1312 (quoting 33 C.F.R. § 209.120 App. D. p. 340). The court found that "[t]his delegation of discretionary authority by the Secretary is well within his statutory power." *Id.* This statement, however, is of little value to the government because it is clearly dicta. The issue before the Fifth Circuit was whether the Secretary could delegate his discretionary authority with regard to § 404 permits to the Chief of Engineers. To answer this question, the court had no need to look any further than the language of § 404 itself which clearly authorizes the Chief of Engineers to issue such permits.

Finally, the recent decision in *Halverson v. Slater,* 129 F.3d 180 (D.C.Cir.1997), which addresses the issue of delegation, further demonstrates that *Giordano* and *Cudahy Packing,* rather than *Fleming,* control the outcome of this case. The issue on appeal in *Halverson* was the authority of the Secretary of the Department of Transportation ("the Secretary") to designate certain responsibilities under the Great Lakes Pilotage Act of 1960, 46 U.S.C. §§ 9301 et seq. ("GLPA"), to the Saint Lawrence Seaway Development Corporation ("Corporation"). The appellants challenged the Secretary's delegation of GLPA responsibilities to the Corporation on several grounds including that the delegation exceeded the Secretary's authority under 46 U.S.C. § 2104(a). To the contrary, the Secretary argued that the delegation to the Corporation was proper under 49 U.S.C. § 322(b).

Relying upon the first step of the *Chevron* analysis, the court concluded that "[t]he plain meaning of section 2104(a) limits delegation of GLPA functions to the United States Coast Guard and that section 322(b) cannot fairly be construed to expand the limitation." *Halverson*, 129 F.3d at 181 (citation omitted). The court began its analysis by looking at the language of, and the relationship between, the two statutes at issue. First, § 2104(a) provides that "[t]he Secretary may delegate the duties and powers conferred by this subtitle (Subtitle II entitled 'Vessels and Seamen') to any officer, employee, or member of the Coast Guard, and may provide for the subdelegation of those duties and powers." 46 U.S.C. § 2104(a). Section 322(b), in turn, provides, in pertinent part, that "[t]he [Transportation] Secretary may delegate, and authorize successive delegations of, duties and powers of the Secretary to an officer or employee of the Department." 49 U.S.C. § 322(b).

The appellants argued that § 2104(a) unambiguously proscribed delegation of GLPA responsibilities outside the Coast Guard and thwarted the Secretary's attempt to delegate these responsibilities pursuant to his general § 322(b) authority. *Id.* at 184. To the contrary, the Secretary argued, similarly to the government in the present case, that because § 2104(a) did not expressly proscribe a § 322(b) delegation, the Secretary could delegate his Subtitle II powers and duties pursuant to § 322(b). *Id.*

The court found that the Secretary's interpretation of § 2104(a) ran afoul of the cardinal rule of statutory construction that " '[w]e must read the statutes to give effect to each if we can do so while preserving their sense and purpose.' " *Id.* at 185 (quoting *Watt v. Alaska*, 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981)) (other citation omitted). The court concluded that the Secretary's reading of § 2104(a) was that it provided no delegation authority beyond what the Secretary already possessed under § 322(b). Such a reading, explained the court, "[v]iolates the familiar doctrine that the Congress cannot be presumed to do a futile thing." *Id.* (citations omitted).

In addition, the court found that the Secretary's view of § 2104(a) was irreconcilable with the canon of statutory construction, *expressio unius est exclusio alterius;* i.e., " 'the mention of one thing implies the exclusion of the other.' " *Id.* (quoting *Ethyl*, 51 F.3d at 1061 (internal quotation omitted)). In this regard, the court concluded that it could not disregard the fact that § 2104(a) authorizes delegations to Coast Guard officials only. *Id.* The court recognized that

> [a]ccording to the expressio unius canon, the Congress, in drafting section 2104(a) this way, intended to exclude delegations to non-Coast Guard officials. And to the extent section 2104(a) may be deemed to conflict with section 322(b) (itself a disfavored construction, ...), the former as the more specific provision controls, again according to the traditional tools of statutory construction.

*Id.* at 185–86 (citations omitted) (footnote omitted).

The court also rejected the Secretary's argument that because Congress did not expressly prohibit delegation of Subtitle II powers and duties to a non-Coast Guard official in § 2104(a), but did so proscribe elsewhere, this omission indicated a legislative intent not to disallow such delegation. Among the reasons for rejecting this assertion, the court found that

> Most significantly, "[t]o suggest, ... that Chevron step two is implicated any time a statute does not expressly negate the existence of a claimed administrative power (i.e. when the statute is not written in 'thou shalt not' terms), is both flatly unfaithful to the principles of administrative law ... and refuted by precedent...." Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well.

*Id.* at 186–87 (quoting *Railway Labor Executives' Ass'n v. National Mediation Bd.*, 29 F.3d 655, 671 (D.C.Cir.1994), *cert. denied*, 514 U.S. 1032, 115 S.Ct. 1392, 131 L.Ed.2d 243 (1995)) (other citations omitted).

Relying upon this reasoning, the court held that "[t]he absence of an express proscription—whether in section 2104(a), section 322(b), GLPA, or the Corporation's statutory charter—provides no green light to ignore the proscription necessarily implied by the limiting language of section 2104(a)." *Id.* at 187.

Like the provisions at issue in *Giordano, Cudahy Packing,* and *Halverson,* § 404's language manifests Congress' intent to limit the individuals to whom the Secretary may delegate his permit issuing authority to the Chief of Engineers. Conversely, unlike the provisions at issue in *Fleming* and *Rodriguez,* § 404 is neither silent on the issue of delegation nor does the CWA contain a general rule-making provision applicable to the Secretary.

If these reasons were not sufficient to render the government's arguments in favor of its interpretation of § 404 unsupportable, the familiar canons of construction set forth in *Halverson* clearly indicate that § 404 must be construed to limit the Secretary's delegation power with respect to his authority to issue permits under this section. First of all, under the principle of *expressio unius est exclusio alterius,* the court cannot ignore the fact that § 404 authorizes delegation to the Chief of Engineers **only**. Moreover, to the extent that § 404 may be deemed to conflict with 10 U.S.C. § 3013(g), and the court sees no such conflict, § 404 as the more specific provision controls. Finally, the fact that § 404 does not expressly proscribe the Chief of Engineers from subdelegating his permit issuing authority to the District Engineers is of no moment. The absence of such an express proscription does not provide the court with a license to ignore the proscription necessarily implied by the explicit limiting language of § 404. *See Halverson,* 129 F.3d at 187.

Accordingly, under step one of the *Chevron* analysis, the court concludes that the language of § 404 unambiguously demonstrates that Congress intended to limit the Secretary's delegation authority to the Chief of Engineers. In other words, any further subdelegation of the Secretary's § 404 permit issuing authority is inconsistent with the plain language of the statute and cannot be countenanced because the Secretary "[m]ust give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781.

The government attempts to overcome the plain meaning of § 404 by reference to the legislative history of the CWA. As the court noted in *Halverson,* "[o]rdinarily [the court] ha[s] no need to refer to legislative history at Chevron step one, ...". *Halverson,* 129 F.3d at 187 n. 10. However, because " '[r]eference to statutory design and pertinent legislative history may often shed some new light on congressional intent, notwithstanding statutory language that appears superficially clear[,]' " *Halverson,* 129 F.3d at 187 n. 10 (quoting *NRDC,* 57 F.3d at 1127 (internal quotation marks omitted)) (other citation omitted), and because the government argues that reading § 404 to deny the Chief of Engineers the authority to subdelegate his authority to issue permits is inconsistent with the legislative history of the CWA and would contradict the express purpose of the Act, the court will consider the government's arguments in this regard.

Relying upon *Inland Empire Public Lands Council v. Glickman,* 88 F.3d 697 (9th Cir.1996), the government argues that without express Congressional authority for subdelegation, one must look to the purpose of the statute to set the parameters of such delegation. At issue in *Glickman* was the Rescissions Act, § 2001(c)(1)(A), 16 U.S.C. § 1611 note, which provided, in pertinent part, that " '[a] document embodying decisions relating to salvage timber sales proposed under authority of this section shall, at **the sole discretion of the Secretary concerned** ..., consider the environmental effects of the salvage timber sale ...' " *Id.* at 701 (quoting § 2001(c)(1)(A), 16 U.S.C. § 1611 note) (emphasis added). Based upon this "sole discretion" language, the plaintiff argued that the Rescission Act required that Secretary Glickman personally authorize all salvage timber sales. *See id.* at 702. To support this interpretation, Inland Empire relied upon the following remarks of Senator Lieberman made on the Senate floor: " ' The timber provision that finally passed contains

a change over previous language to expand the role of the Secretary of Agriculture to require his signature in order to implement new sales.'" *Id.* at 702 (quoting 151 Cong. Rec. S10465 (July 21, 1995)). The court rejected this argument, finding that "[t]he floor statements of an individual member of Congress who did not sponsor the bill, ..., have limited value in interpreting congressional intent." *Id.* The court nonetheless concluded that "[r]equiring Secretary Glickman to personally authorize every timber sale would contradict the purpose of the Rescissions Act, which is to expedite such sales. Moreover, 'delegation generally is permitted when it is not inconsistent with the statute.'" *Id.* (quoting *National Ass'n of Psychiatric Treatment Ctrs. for Children v. Mendez*, 857 F.Supp. 85, 91 (D.D.C.1994)) (other citation omitted). In reaching its conclusion that Secretary Glickman need not personally authorize salvage timber sales, the Ninth Circuit distinguished *Giordano*. It did so on the grounds that the statute at issue in *Giordano* .expressly described to whom authority could be delegated and concluded that *Giordano* applied only to statutes that explicitly restricted delegation. *Id.* at 703.

The government's reliance upon *Inland Empire* is clearly misplaced given the plain language of § 404. Unlike the statute at issue in *Inland Empire*, § 404 explicitly restricts the Secretary's delegation authority. Moreover, it can be inferred from the Ninth Circuit's discussion of *Giordano* that the court might have reached a different conclusion had the Rescission Act expressly described to whom authority could be delegated.

Secondly, the government contends that at the time the CWA was enacted one of Congress' primary concerns was the length of delay in processing permit applications. Moreover, the government asserts that the legislative history of the CWA makes clear that the sheer number of applications alone was alarming. Of particular concern, according to the government, was the unnecessary paperwork and delays in the § 404 permitting process.

To support this contention, the government directs the court's attention to 33 U.S.C. § 1251(f) which provides that

[i]t is the national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government.

33 U.S.C. § 1251(f).

Relying upon this provision, the government asserts that requiring the Secretary or the Chief of Engineers to evaluate personally every individual permit application would not only contradict one of the purposes of the CWA which is to expedite the permit process but would also functionally halt the issuance of permits nationwide.

Although § 1251(f) clearly encourages efficient management of the permitting process, there is no indication that the provision was intended to require, or even recommend, that the authority to issue § 404 permits should be delegated to the Chief of Engineers' subordinates. In fact, § 1251(f) appears to be directed more at the problems of "inter-agency" communication rather than at "intra-agency" communication. Thus, the court concludes that § 1251(f) does nothing to clarify Congress' intent in promulgating § 404. Nor does it support the government's position that defendants' interpretation of § 404 is inconsistent with the purpose of the CWA.

The government also asserts that the legislative history of the CWA is replete with debate over the Corps' exact role in implementing legislation and that the record makes clear that Congress contemplated that the § 404 permit program would be administered by the Chief of Engineers through his necessary representatives. In this regard, the government directs the court's attention to Senate Bill 2770 which was introduced by Senator Muskie on October 28, 1971. This bill sought to amend the Federal Water Pollution Control Act to give the Secretary of the Army the authority to issue § 404 permits in light of his responsibilities under the Rivers and Harbors Act. *See* Government's

Memorandum of Law in Response to Defendants' Motion to Dismiss Counts 2–31 at 11 (citing 117 Cong. Rec. 538853–54 (daily ed. Nov. 2, 1971) (proposal by Sen. Ellender)). Opponents of the amendments questioned the propriety of "shift[ing] the environmental evaluation authority from EPA to the Corps of Engineers." *See id.* (quoting 117 Cong. Rec. 538854 (daily ed. Nov. 2, 1971) (remarks of Sen. Muskie)). At the same time, under the House amendment, a separate permit program was established for the discharge of dredged or fill material into navigable waters to be administered by the Secretary of the Army acting through the Chief of Engineers. *See id.* (citing 118 Cong. Rec. H10828 (daily ed. Mar. 29, 1972); S. Conf. Rep. No. 92–1236, 92 Cong., 2d Sess., Sept. 28, 1972, 1972 U.S.C.C.A.N. 3776, 3818). The Conference Substitute bill adopted this provision from the House amendment and provided that the § 404 permit program would "be administered by the Corps of Engineers." *See id.* (quoting 118 Cong. Rec. H33752 (daily ed. Oct. 4, 1972)). Based upon this limited legislative history, the government concludes that the Senate was uniquely aware of the process by which dredge and fill permits were handled and that Congress, as of 1972, intended the § 404 permit program to be administered by the Chief of Engineers through his necessary representatives within the Corps. *See id.*

The government goes on to assert that the 1977 debates support this conclusion. First of all, the government directs the court's attention to the remarks of Representative Clausen regarding the Corps' procedures for promulgating regulations related to its authority to control dredge and fill operations. *See id.* at 12 (citing 123 Cong. Rec. H10403 (daily ed. Apr. 5, 1977) (remarks of Rep. Clausen)). Secondly, the government states that when Congress amended the CWA in 1977, the regulations governing the § 404 permit program were already in effect, *see* 33 C.F.R. § 209.120, and that numerous references were made to them. The government argues that despite the fact that Congress knew how the Corps administered the § 404 program, it chose not to address the issue. From this lack of discussion, the government concludes it is reasonable to assume Congress approved of these procedures and regulations. *See id.*

In response to the government's arguments, defendants assert that the legislative history which the government cites is not only often misleading or taken out of context but is, more importantly, entirely unpersuasive.[5] *See* Defendants' Reply Memorandum of Law in Support of Motion to Dismiss Counts 2–31 at 7–8. With respect to the 1972 Senate Report cited by the government, defendants contend that the Senate attributed the inefficiency of the pre-CWA programs primarily to the fact that the authority was divided between two federal agencies, a problem the Senate bill proposed, unsuccessfully, to remedy by giving the EPA total control over CWA permitting. *See id.* at 7 n. 5 (citing S.Rep. No. 92–414, 92d Cong.2d Sess., 1972 U.S.C.C.A.N. 3668, 3672). In addition, according to defendants, the bill which the cited report discusses did not contain § 404 in any form nor did it give the Corps any role in the permitting process. *See id.* n. 5 (citing S.Rep. No. 92–414, 92d Cong.2d Sess., 1972 U.S.C.C.A.N. 3668, 3736–40). Thus, defendants argue that this report sheds no light on the proper interpretation of § 404 or Congress' intentions re-

**5.** Before addressing the merits of the government's arguments, defendants assert that resort to legislative history is unnecessary and improper because the text of the CWA is unambiguous. *See* Defendants' Reply Memorandum of Law in Support of Motion to Dismiss Counts 2–31 at 6 (quoting *West Virginia University Hosps., Inc. v. Casey*, 499 U.S. 83, 98–99, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68 (1991) ("[t]he best evidence of that purpose [of the statute] is the statutory text adopted by both Houses of Congress and submitted to the President. Where that contains a phrase that is unambiguous—that has a clearly accepted meaning in both legislative and judicial practice—we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process.")). Although the court agrees with defendants that ordinarily the court has no need to refer to legislative history when the text of a statute is unambiguous, for the reasons noted above the court has decided that it will review such history in this case to determine if that history sheds any light on Congress' intent. *See Halverson,* 129 F.3d at 187 n. 10.

garding the Corps' permitting authority under the CWA as ultimately passed. *See id.*

In addition, defendants contend that not a single citation upon which the government relies pertains to the issue of subdelegation authority. *See id.* at 8. Moreover, according to defendants, not one statement purports to express the view of even a single legislator, much less the House or Senate Committees or Congress as a whole, regarding whether the Chief of Engineers should be allowed to assign to inferior officials of the Corps his power to issue § 404 permits. *See id.* Thus, defendants conclude that the legislative history upon which the government relies is of little or no value in determining the meaning of § 404(d). *See id.* (citing *Regan v. Wald,* 468 U.S. 222, 237, 104 S.Ct. 3026, 3035, 82 L.Ed.2d 171 (1984) ("Oral testimony of witnesses and individual Congressmen, unless very precisely directed to the intended meaning of particular words in a statute, can seldom be expected to be as precise as the enacted language itself. To permit what we regard as clear statutory language to be materially altered by such colloquies would open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on by Congress and signed into law by the President.")).

Finally, defendants assert that in all the legislative materials regarding the CWA during 1972 and 1977, the mechanics of permit issuance under § 404 were almost never addressed. *See* Defendants' Reply Memorandum of Law in Support of Motion to Dismiss Counts 2–31 at 8. By way of example they note that in 1972, the only issue regarding the Corps was whether to include § 404 at all; and in 1977 § 404(d) was created through a technical amendment that simply moved the relevant language from § 404(a), an amendment that did not receive even a single sentence of explanation in the committee reports. *See id.* n. 6. Moreover, defendants claim that in the rare instances when these issues were mentioned, the committee reports simply reiterated the language of the statute itself: § 404 permits are to be issued by " 'the Secretary of the Army, acting through the Chief of Engineers.' " *See id.* (quoting H.R.Rep. No. 92–911, 92d Cong.2d

Sess. at 63 (1972); Conf. Rep. No. 92–1236, 92d Cong.2d Sess, 1972 U.S.C.C.A.N. 3776, 3818).

With respect to the government's argument concerning the general statements endorsing the idea that § 404 permits should be issued efficiently and that unnecessary delays should be eliminated, defendants counter that such statements indicate nothing about how Congress wished to create efficiencies or eliminate the delays or what delays Congress considered unnecessary. *See id.* at 9. Moreover, defendants assert that the government failed to note that the principal substantive changes to § 404 under consideration in 1977 were the enactment of blanket exemptions from § 404 permit requirements; a limitation on the Corps' jurisdiction over wetlands; and the enactment of a system of nationwide, or general, permits which relieved a large number of applicants from the need to seek individual permits. *See id.* (citing S.Rep. No. 95–370, 95th Cong., 1st Sess., 1977 U.S.C.C.A.N. 4326, 4400). Therefore, defendants conclude that to the extent the statements that the government cites had anything to do with § 404, it was in connection with these changes. *See id.* at 9.

Finally, defendants reject the government's reliance upon the Rivers and Harbors Act. In this regard, they assert that under the precise set of regulations the government contends Congress had in mind as its model when it assigned § 404 permitting responsibility to the Chief of Engineers in 1972—those implementing the Corps' authority under § 10 of the Rivers and Harbors Act—the Chief of Engineers was required to exercise his personal discretion with respect to every significant permit application. *See* Defendants' Reply Memorandum of Law in Support of Motion to Dismiss Counts 2–31 at 10 (citing 33 C.F.R. § 209.120(c) (1971)). Pursuant to this regulation as it existed in 1971, the Chief of Engineers

[a]uthorized Division and District Engineers to issue direct from their own offices, in the name of the Secretary of the Army, permits under Sections 10 and 14 of the Act of March 3, 1899, for work and structures in or over navigable waters in cases which are entirely routine and which

involve no doubt as to the law, facts, or regulations nor any opposition or other consideration which should be decided by higher authority.... All applications for permits not falling within the above provisions will be forwarded for the consideration of the Chief of Engineers.

33 C.F.R. § 209.120(c)(iii) (1971).[6]

Relying upon this regulation, defendants argue that if

"Congress knew that the Corps was already issuing section 10 permits for construction and dredge and fill activities in accordance with these regulations, including those that authorize delegation, and it is reasonable to assume that Congress expected the Corps to use similar procedures for the new [ § 404] permit program," Opp. at 12, it would establish that the procedures used to issue the Iroquois permit were contrary to congressional intent; under the 1971 Rivers and Harbors Act regulations, the Chief of Engineers, and not a District Engineer, would have been required to personally issue the Iroquois permit.

*See* Defendants' Reply Memorandum of Law in Support of Motion to Dismiss Counts 2–31 at 11.[7]

The court's review of the legislative history of the CWA, with particular reference to § 404, makes clear that this history offers little, if any, support for the government's reading of § 404. While the language of § 404 is unambiguous, the same cannot be said for the legislative history upon which the government relies. Thus, the court concludes that the government's attempts to overcome the plain meaning of § 404 by reference to the legislative history of the CWA are unconvincing.

### C. Conclusion

For the foregoing reasons, the court finds that the Secretary lacks the authority to promulgate regulations permitting further subdelegation of his permit issuing power

---

**6.** The 1997 version of Title 33 of the Code of Federal Regulations does not include § 209.120.

**7.** Although not specifically stated, the court assumes that defendants reach this conclusion

under § 404 to the District Engineers. Since § 1319(c) of the CWA punishes violations of requirements "in a permit issued under section 1344 [ § 404] of this title by the **Secretary of the Army** ...," *see* 33 U.S.C. § 1319(c)(1)(A), (c)(2)(A) (emphasis added), and the Iroquois Permit was **not** issued by the Secretary of the Army, the court must conclude that this permit cannot serve as the basis for the criminal prosecution of defendants. Accordingly, because Counts 2–31 are based upon allegations that defendants violated requirements contained in a permit, the violation of which is not proscribed by § 1319(c), the court **GRANTS** defendants' motion to dismiss Counts 2–31 of the Indictment.

In light of this decision, the court strikes any claims in Count 1 of the Indictment which are based upon violations of the Iroquois Permit. In addition, although the court's dismissal of Counts 2–31 renders unnecessary the court's review of defendants' other motions, the court will, nevertheless, address the remaining requests for relief. In doing so, the court will assume that the Iroquois Permit was validly issued.

### II. Motion to Dismiss Counts 14–19 of the Indictment

#### A. Introduction

The allegations contained in Counts 14–19 are based upon Note 7 which appears in two typical construction drawings attached to the Iroquois Permit. This Note provides that "[c]lay plugs or ditch breakers will be installed in trench at wetland edge to prevent changes in the natural drainage patterns. Water level and flow in wetland will be maintained during and after construction." *See* Exhibits attached to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss Counts 14–19 ("Defendants' Joint Exhibits") at Vol. I, Tab 1. The two drawings on which Note 7 appears are entitled "Typical Non Flooded Wetland Crossing

---

based upon their contention that the Iroquois Permit was not "entirely routine" within the meaning of 33 C.F.R. § 209.120(c)(iii) (1971).

Utilizing A Construction Work Pad" and "Typical Flooded Wetland Crossing Utilizing The Ditch and Pull Method." These two drawings, together with twenty-two others, are attached to the Iroquois Permit. In addition, the "Project Description" section of the Iroquois Permit provides that "[a]ll work shall be performed in accordance with the attached project drawings, subject to Special Conditions 1–18 hereby made part of this authorization." *See* Defendants' Joint Exhibits at Vol. I, Tab 2 at 1.

## B. Analysis

The gravamen of defendants' motion to dismiss Counts 14–19 is four-fold. First, they argue that Note 7 is not a requirement of the Iroquois Permit. Second, they assert that the Corps has no authority to impose a permit requirement aimed only at preventing wetland drainage. Third, they contend that even if Note 7 were a valid permit requirement, the plain language and regulatory history of this note contradict the broad interpretation given to it by the government; i.e., that a clay plug or ditch breaker was required to be installed at each edge of a wetland, regardless of need, wherever the trench crossed a wetland. Fourth, they claim that because Note 7 is, at best, susceptible to numerous interpretations, it is not a legitimate basis for criminal prosecution.

The government's response is two-fold. First, it asserts that Note 7 is a requirement of the Iroquois Permit and is not unconstitutionally vague either on its face or as applied to defendants. Second, the government argues that the Corps has the authority under the CWA to implement requirements such as that found in Note 7, the purpose of which is to require the installation of erosion control devices to prevent the drainage of wetlands.

The court will address each of defendants' arguments, and the government's response thereto, seriatim.

### 1. Note 7 is Not a Requirement of the Iroquois Permit

Defendants assert that the typical construction drawings of which Note 7 is a part were attached to the Iroquois Permit only to illustrate the general activities ex-

pected to occur on the project. To support this argument, defendants note that neither Note 7 nor the typical construction drawings in which it is incorporated are discussed or mentioned in the "Permit Conditions" section of the Iroquois Permit, which sets forth six general conditions and eighteen special conditions upon which the issuance of the Iroquois Permit was founded.

Although defendants acknowledge that the typical construction drawings are mentioned in the "Project Description" section of the Iroquois Permit, they argue that the phrase in that section that "all work shall be performed in accordance with the attached project drawings" is properly viewed as part of the general description of the work the Corps authorized Iroquois to perform within the waters of the United States, rather than as a stated requirement imposed by the Iroquois Permit. Moreover, defendants assert that their interpretation of this phrase is in conformity with the stated purpose of the "Project Description" which is not to satisfy or impose CWA requirements but rather to "describe the permitted activity and its intended use with references to any attached plans or drawings that are considered to be a part of the project description." 33 C.F.R. Pt. 325, App. A at 427 (1997).

Defendants further claim that their interpretation of the purpose of the "Project Description" section of the Iroquois Permit is reinforced by the inclusion of more than four pages of specific "Permit Conditions" within this permit. None of the eighteen Special Conditions contained in the Iroquois Permit refer to the "Typical Drawings" attached to the permit, even though some of these conditions include construction procedures and standards set forth in other sources, such as Appendices C and D of the FEIS.

As further support for their position that Note 7 is not a permit requirement, defendants argue that nothing in either the drafting history of the typical construction drawings or the Iroquois Permit reflects any intention by the Corps to impose a breaker requirement on Iroquois. In this regard, defendants direct the court's attention to the Corps' Record of Decision ("ROD") which was prepared prior to the

issuance of the Iroquois Permit. *See* Defendants' Joint Exhibits at Vol. I, Tab 3. This ROD refers to the two typical construction drawings which contain Note 7 as depicting "the two different methods of installing the pipeline across wetlands." *See id.* at Vol. I, Tab 3 at 3. However, the ROD does not mention Note 7 in particular or a breaker requirement in general, although it does provide that "[a]fter the pipeline is installed, ... preconstruction hydrologic conditions [will be] restored." *See id.*

Finally, defendants note that Trans–Canada Pipelines, Ltd., the founding and majority partner of the Iroquois project, prepared all of the "Typical Drawings." Defendants surmise, without providing any tangible support for this assumption, that the language in Note 7 most likely reflects Iroquois' effort to assimilate the standards found in Trans–Canada's "Environmental Protection Practices Handbook" and "Pipeline Construction Specifications." The 1986 edition of the "Environmental Protection Practices Handbook" provides "[p]rotect critical areas during construction by such measures as: the installation of ditch breakers and ditch plugs to prevent water flow along the trench; ..." *See* Defendants' Joint Exhibits at Vol. I, Tab 4 at 38. Moreover, the March 1988 "Pipeline Construction Specifications" booklet provides that

> [t]he Contractor shall furnish all sacks, foam, wood, or other materials ... necessary to install breakers in the trench, under, over and around the pipe to provide full protection against washout of padding or backfill materials and changes in the natural drainage pattern.... Breakers shall only be placed as shown on drawings or as directed by the Company.

*See id.* at Vol. I, Tab 5 at 3.

The government's response to defendants' argument that Note 7 is not a permit requirement is combined with its response to defendants' assertion that this alleged requirement is vague. To put it succinctly, the government contends that the permit application makes it absolutely clear that Iroquois proposed the wetland breaker obligation and in no way limited this requirement to temporary installation during construction, to instances where water was flowing in the trench, or to perched wetlands. In this regard, the government directs the court's attention to the "Application of Iroquois Gas Transmission System for Department of the Army Permit (Amended Request)," Exhibit G "Evaluation of the Iroquois Gas Transmission System for Compliance with Federal Guidelines for Specification of Disposal Sites for Dredged or Fill Material." *See id.* at Vol. I, Tab 6. In addressing wetlands, this document provides that "[d]redge and fill activities associated with pipeline construction will not result in any permanent loss of wetlands. Following construction activities, ... trench breakers will be used to ensure that the trench does not drain the wetland." *See id.* at Vol. I, Tab 6 at 4–19. In addition, Exhibit A to the application, entitled "Detailed Description of Proposed Activity," includes the two typical construction drawings which contain Note 7. *See id.* at Vol. I, Tab 6 at Exhibit A.

■ Having reviewed the relevant documents, the court finds defendants' arguments with respect to Note 7 unconvincing. Given the inclusion of the typical construction drawings containing Note 7 in both the permit application and the Iroquois Permit itself as well as the language of the "Project Description" section of the permit that "all work shall be performed in accordance with the attached project drawings," the court concludes that Note 7 constitutes a permit requirement. Moreover, to the extent that the phrase "subject to Special Conditions 1–18" affects Note 7, the court finds that its purpose is to modify the reach of Note 7 not to replace it. In other words, to the extent that any requirement contained in Special Conditions 1–18 conflicts with the typical construction drawings, including Note 7, the Special Conditions apply. Accordingly, to the extent that defendants' motion to dismiss Counts 14–19 rests **solely** upon their argument that Note 7 is not a requirement of the Iroquois Permit, the court denies the motion.

### 2. Corps Has No Authority to Impose a Permit Requirement Aimed Only at Preventing Wetland Drainage

■ Defendants argue that even if Note 7 is a requirement of the Iroquois Permit, it is

invalid because the Corps is without authority under the CWA to require the installation of trench breakers to prevent wetland drainage. Citing § 404, defendants assert that the Corps' authority is limited to issuing "dredge and fill" permits and to approving and selecting dredge and fill disposal sites within the waters of the United States. *See* 33 U.S.C. § 1344(a), (b). It follows, according to defendants, that because § 1319(c) authorizes prosecution only for violations of requirements imposed under the authority of § 404 and the Corps has no authority under § 404 to require the installation of trench breakers to prevent wetland drainage Counts 14–19 do not state a crime under § 1319(c).

To support this argument, defendants rely upon two Fifth Circuit decisions. *See Orleans Audubon Soc'y v. Lee*, 742 F.2d 901 (5th Cir.1984); *Save Our Community v. United States Envtl. Protection Agency*, 971 F.2d 1155 (5th Cir.1992). In *Orleans Audubon Society*, the district court dismissed a complaint which sought declaratory and injunctive relief from a Corps decision not to require a permit for, among other things, installation of drainage culverts. On appeal, the Fifth Circuit affirmed the decision, finding that the installation of the drainage culverts at issue did not involve a discharge regulable under the CWA.

At the time the Corps made its decision that no permit was required for the installation of the drainage culverts, it had determined that the installation did not involve any work upon the wetlands; nor did it result in the depositing of dredge or fill material into the wetlands. Therefore, the Corps concluded that it had no basis to assert jurisdiction over the culvert installations. The Fifth Circuit agreed. Reviewing the record, the court noted that "[a]fter the culverts were installed, only clear water from within the . . . tract flowed into the drainage canal. Clear water is not within the definition of a pollutant under the CWA." *Orleans Audubon Soc'y*, 742 F.2d at 910. The court went on to note that although the plaintiff contended that a "plug" of dirt was washed through the canal during the installation of the culverts, the record did not support this "fact." Rather, the deposition of a Corps

official indicated that the Corps had no evidence before it to confirm that dirt had been deposited in either the tract or the canal and that had the Corps found evidence of the depositing of dredged or fill material, the Corps would have asserted jurisdiction under the CWA. *See id.* at 910–11.

In the present case, there is no dispute that the Corps had jurisdiction under the CWA over that part of the Iroquois project which involved discharges of dredged or fill material into navigable waters. As such, the situation in *Orleans Audubon Society* is inapposite to the present case and the Fifth Circuit's finding that it was reasonable for the Corps to conclude it did not have jurisdiction over that particular project does not foreclose a finding of jurisdiction in this instance.

The court reached a similar conclusion in *Save Our Community*. In that case, the plaintiffs brought suit challenging the draining of several ponds on the site of a proposed expansion of a 73–acre landfill. They sought, among other relief, a declaration that the Corps and the EPA either failed to perform a duty to enforce § 404 provisions or incorrectly interpreted the CWA by concluding that draining is not a regulated activity under that statute. The district court held as a matter of law that the draining activity required a permit. The Fifth Circuit disagreed.

Like *Orleans Audubon Society*, *Save Our Community* involved a situation in which no discharge of dredged or fill material was involved. The Fifth Circuit in *Save Our Community* found that "[t]he existence of discharge is critical. . . . The discharge of effluent is not, . . ., merely an aggravating factor when addressing whether or not a section 404 permit is required. On the face of the statute, it is the requirement for statutory coverage." *Save Our Community*, 971 F.2d at 1163. Thus, the Fifth Circuit concluded that "[w]ithout the existence of an effluent discharge of some kind, there is no coverage under section 404. There is no jurisdiction for the agencies or the courts to act." *Id.* at 1164.

Although the government does not discuss these cases in detail, it does distinguish them

by arguing that the Corps has the authority to regulate drainage activities in situations in which jurisdiction is founded upon another basis which does require a § 404 permit. To support this conclusion, the government notes that in reviewing permit applications, the Corps is required by other federal statutes to consider numerous factors beyond the dredging and filling of wetlands. For example, the Corps must consult with the United States Fish and Wildlife Service in accordance with the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661–666c. In addition, the Corps is required by its own regulations to consider water quality, the effect of the project on historical, cultural, scenic and recreational values, and the requirements of other federal, state, and local entities. *See* 33 C.F.R. § 320.4. Moreover, in projects involving wetlands, the Corps' regulations clearly provide that

> [n]o permit will be granted which involves the alteration of wetlands identified as important by paragraph (b)(2) of this section or because of provisions of paragraph (b)(3) of this section unless the district engineer concludes, on the basis of the analysis required in paragraph (a) of this section, that the benefits of the proposed alteration outweigh the damage to the wetlands resource.

33 C.F.R. § 320.4(b)(4).

Finally, the government argues that in determining whether to issue a § 404 permit the Corps is required to ensure that the discharge authorized complies with the EPA's § 404(b)(1) guidelines. *See* 33 C.F.R. § 320.4(a)(1). These guidelines provide, in pertinent part, that "[n]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a).

What the arguments of defendants and the government make clear is that unlike the Fifth Circuit in *Save Our Community* and *Orleans Audubon Society*, this court must address two issues in order to resolve the present motion. Although these issues are intertwined, they are not, despite the parties' attempts to make them so, identical. First, the court must determine, as the Fifth Circuit did, whether the Corps had jurisdiction over any part of the instant project. Second, the court must decide whether, in exercising this jurisdiction, the Corps had the authority to include in the Iroquois Permit a requirement, the sole purpose of which was to ensure that the construction of the pipeline trench would not result in the drainage of wetlands.

The first issue does not require much discussion. In its ROD, filed prior to the issuance of the Iroquois Permit, the Corps identified the two Iroquois construction activities over which it had jurisdiction under § 404: "[t]he backfilling of trenches excavated in waterways and wetland areas, and the placement of any temporary fills in waters of the United States necessary to support construction activities." *See* Defendants' Joint Exhibits at Vol. I, Tab 3. To the extent that the Iroquois project encompassed such activities, *Save Our Community* and *Orleans Audubon Society* make clear that the Corps had jurisdiction to issue a § 404 permit for the same. This having been said, however, the more important issue is whether in the exercise of this jurisdiction the Corps had the authority to include as part of the Iroquois Permit a requirement, such as Note 7, which concerns procedures intended solely to prevent the drainage of wetlands.

*Save Our Community* and *Orleans Audubon Society* did not have to address this latter issue because neither concerned a project which involved the discharge of dredged or fill material over which the Corps could exercise jurisdiction. However, there is case law which does address situations similar to the one present here and which undermines the government's assertion that once the Corps attains jurisdiction over some part of a project it may exercise its authority over all aspects of that project, even those that do not involve the "discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a).

Section 404, by its very terms, limits the Corps' authority under the CWA to the regulation of the discharge of dredged or fill

material into navigable waters. This statute neither mentions the draining of wetlands nor provides the Corps with the authority to regulate such drainage. As the Fifth Circuit made clear, unless such drainage involves a discharge of dredged or fill material, the Corps has no authority or jurisdiction to prevent such drainage. Other courts have reached the same conclusion. For example, in *Salt Pond Assocs. v. United States Army Corps of Eng'rs*, 815 F.Supp. 766 (D.Del. 1993), the court rejected the government's argument that "[p]ursuant to its duties to protect the overall public interest, to protect the particular values of wetlands and to apply the EPA's guidelines, it is empowered to include any and all 'special conditions' as part of a permit decision for regulated activities over which it does have jurisdiction." *Id.* at 781–82.

Likewise in *Natural Resources Defense Council, Inc. v. United States Envtl. Protection Agency*, 859 F.2d 156 (D.C.Cir.1988) ("*NRDC II*"), the court confronted a similar attempt by the Environmental Protection Agency ("EPA") to expand its authority pursuant to its NEPA-mandated duty to consider all "'direct, indirect, and cumulative' environmental effects of the discharge of pollutants by the potential permittee." *Id.* at 169 (quoting 40 C.F.R. §§ 1508.7–.8, 1508.18 (1987)). The court noted that despite the requirement that the EPA undertake such a review, it could "[p]roperly take only those actions authorized by the CWA— allowing, prohibiting, or conditioning the pollutant discharge." *Id.* at 169–70 (citing 33 U.S.C. § 1342; *NRDC v. EPA*, 822 F.2d 104, 129 (C.A.D.C.1987) ("EPA's jurisdiction [under the CWA] is limited to regulating the discharge of pollutants....")) (footnote omitted). Finally, the court concluded that "[r]equiring the Administrator to consider factors is a far cry from authorizing the imposition of any conditions the Administrator finds desirable in particular permits." *Id.* at 170.

The government's reliance upon the § 404(b)(1) guidelines to extend the Corps' jurisdiction beyond the regulation of discharges of dredged or fill material into navigable waters is also misplaced. These guide-lines limit themselves to the evaluation of how proposed discharges of dredged or fill material will affect the physical, chemical and biological characteristics of aquatic ecosystems or related human uses. *See* 40 C.F.R. §§ 230.20–.54. As the court noted in *Monongahela Power Co. v. Marsh*, 809 F.2d 41 (D.C.Cir.1987), these guidelines "[a]ddress the potential losses to be expected from discharges and the means for minimizing them." *Id.* at 52 (footnote omitted). Nothing in these guidelines, however, supports the government's contention that the Corps may regulate construction activity which is not directly related to the discharge itself.

Finally, despite the government's assertion to the contrary, the Corps' regulations do not support an extension of the Corps' authority under the CWA to encompass non-discharge activities. Although these regulations mandate that "[n]o discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the aquatic ecosystem," 40 C.F.R. § 230.10(d), the operative language requires that the step taken be directly related to a discharge. This point is made abundantly clear by reviewing the types of steps which subpart H of the Corps' regulations identifies as possible techniques for minimizing any adverse impact of the discharge. These steps include actions concerning the location of the discharge, § 230.70; concerning the material to be discharged, § 230.71; controlling the material after discharge, § 230.72; affecting the method of dispersion, § 230.73; relating to technology, § 230.74; affecting plant and animal populations, § 230.75; and affecting human use, § 230.76. *See* 40 C.F.R. §§ 230.70–.76. Although admittedly subpart H is not intended to be an exhaustive list of appropriate measures, none of the steps mentioned even remotely indicate an intent to regulate the drainage of wetlands.

As this discussion makes clear, unless Note 7 constitutes a requirement directly related to the discharge of dredged or fill material into navigable waters, either by encompassing the discharge itself or by minimizing the effect of such a discharge, it is outside the scope of the Corps' jurisdiction

under the CWA to enforce. Even the government does not seriously contend that Note 7 constitutes such a requirement. By its very terms, Note 7 is intended to ensure that as the trench for the pipeline is dug, there will be no changes in the natural drainage patterns of the waterways and that the level and flow of the wetland will be maintained during and after construction. In other words, Note 7 is intended to ensure that the construction of the pipeline trench does not result in the drainage of any wetlands. However, as the Fifth Circuit made clear, the draining of wetlands is not within the scope of the Corps' jurisdiction under § 404. Nor are dredging operations which might encompass the de minimis incidental soil movement or fallback. *See Salt Pond Assocs.*, 815 F.Supp. at 778 n. 34.

■ Moreover, there is nothing in Note 7 to indicate that it is in any way connected to either of the discharge activities which the Corps identified in its ROD as within its § 404 jurisdiction. Therefore, despite the fact that pursuant to other federal statutes, the § 404(b)(1) guidelines, and its own regulations, the Corps is required to undertake a review of factors which are not within its jurisdictional mandate, the Corps may not impose a condition in a § 404 permit, no matter how desirable, which is not directly related to a discharge of dredged or fill material into navigable waters. *See NRDC II*, 859 F.2d at 169–70. Therefore, because Note 7 is not related to such a discharge, the court concludes that the Corps was without authority to include Note 7 as a requirement of the Iroquois Permit and, thus, the government may not prosecute defendants for alleged violations of the same. Accordingly, the court grants defendants' motion to dismiss Counts 14–19 of the Indictment.

### 3. *Vagueness and The Proper Interpretation of Note 7*

■ Although the court need not address defendants' other arguments in support of its motion to dismiss Counts 14–19 given the court's decision in part II.B.2 *supra*, it will, nonetheless, do so in the interest of completeness.

Defendants' third and fourth arguments in support of their motion to dismiss Counts 14–19 are intertwined. Basically, defendants contend that Note 7 is not a legitimate basis for criminal prosecution because it is, at best, susceptible to numerous interpretations. Specifically, defendants claim that the government's interpretation of Note 7; i.e., that a clay plug or ditch breaker was required to be installed at both edges of a wetland, regardless of need, wherever the trench traversed a wetland, is not supported by the plain language and regulatory history of Note 7.

In this regard, defendants assert that during the permitting process, Iroquois expressed to the Corps and other agencies its understanding that ditch breakers or clay plugs would be installed only where necessary to prevent changes in the natural drainage patterns of the wetlands. To support this proposition, defendants direct the court's attention to several statements Iroquois made during the permitting process. For example, Iroquois' application to the Federal Energy Regulatory Commission ("FERC") for a Certificate of Public Convenience and Necessity provides that "[w]here the trench intersects streams, wetlands, or groundwater **and where site conditions might result in drainage** from the intersected body of water, the trench will be blocked with impervious materials such as sack breakers or clay." *See* Defendants' Joint Exhibits at Vol. I, Tab 7 at 3–24 (emphasis added); *see also id.* at Vol. I, Tab 8 at 2–12 (same); *id.* at Vol. II, Tab 13 at 4–40 (same).

In addition, the permit application itself contains several references to the use of trench breakers, each of which refers to their installation "where necessary" or "to ensure the wetland's hydrologic integrity." *See id.* at Vol. I, Tab 6 at 3–7 ("the points at which the trench enters and exits a wetland will be sealed with breakers to ensure the wetland's hydrologic integrity . . ."); *id.* at Vol. I, Tab 6 at 7 ("following pipe installation the wetland boundaries will be sealed with impervious plugs to ensure the wetland's hydrologic integrity"); *id.* at Vol. I, Tab 6 at 4–19 ("trench breakers will be used to ensure that the trench does not drain the wetland").

Based upon these statements, defendants assert that the permit application does not establish an intent to install permanent ditch breakers at every wetland edge. Rather, they assert that it reflects an intent to use breakers to seal wetland boundaries to ensure hydrologic integrity. In other words, the intent was that Iroquois would install such ditch breakers **where necessary**.

Likewise, defendants contend that Iroquois' responses to questions by FERC and the Corps support defendants' understanding of the ditch breaker requirement. In this regard, FERC asked Iroquois to "Discuss techniques that would be used to: (a) prevent wetland drainage especially in perched wetlands where blasting would be required; ..." *See* Defendants' Joint Exhibits at Vol. II, Tab 11 at 1. In response, Iroquois stated,

> In general, to prevent drainage of wetlands during construction, impervious plugs or trench breakers will be installed in the trench at the edges of wetlands to insure that water does not drain from the wetland. Permanent ditch breakers will be installed in the trench if there is a possibility that wetland drainage could occur after backfilling....

*See id.*

The Corps posed a similar question to Iroquois: "What methods will be used to ensure that the pipe trench does not serve to drain perched wetlands or that construction does not breach an impervious layer?" *See id.* at Vol. II, Tab 12 at 2–7. To which Iroquois responded,

> Iroquois is well aware that there exist along its proposed route various wetlands that consist of areas perched over bedrock. In order to restore wetlands in such areas, if it appears that pipeline installation has breached an impervious layer, Iroquois will investigate the use of bentonite (clay) or other impervious material in the bottom of the trench in order to seal any fissures in the rock that may have been created by pipeline construction activities. Iroquois also will install trench breakers at the points where the trench enters and exits

any wetland. This will ensure that the pipe trench does not act as a conduit for the lateral movement of water that could serve to drain the wetland (and which, of course, is also undesirable from a pipeline stability perspective).

*See id.* at 2–7—2–8.

In addition to these answers, defendants direct the court's attention to the December 2, 1994, version of FERC's "Wetland and Waterbody Construction and Mitigation Procedures" to support their assertion that there is no industry standard that requires the installation of trench breakers at every wetland. In particular, defendants cite the following: "Where the pipeline trench may drain a wetland, construct trench breakers and/or seal the trench bottom as necessary to maintain the original wetland hydrology." *See id.* at Vol. II, Tab 16 at 12. Furthermore, defendants note that even after obtaining a guilty plea from Iroquois with regard to breaker placement at wetland edges, the government did not require Iroquois to install a single breaker at any wetland edge.[8] Nor, according to defendants, did the Corps or any other agency that closely monitored the pipeline construction ever criticize the manner in which the breakers were being installed at the wetlands or instruct Iroquois to install breakers at the edge of each wetland crossed. Finally, defendants contend that even if their interpretation of Note 7 is not the only reasonable one, it is certainly a reasonable interpretation which together with the language and history of Note 7, at a minimum, requires the court to rely upon the rule of lenity and construe Note 7 in defendants' favor.

Relying upon many of the same arguments, defendants also argue that the trench breaker requirement contained in Note 7 is unconstitutionally vague and is, therefore, not a legitimate basis for a criminal prosecution. According to defendants, this requirement's vagueness stems from two distinct but related problems. First, defendants assert that the manner in which the requirement was imposed—by means of a note in a typical

---

8. At oral argument, the government explained that the reason it did not require Iroquois to install any breakers at wetland edges at this late date is because such activity would have caused more damage to the area.

construction drawing—makes the very existence of the requirement ambiguous at best. Second, defendants contend that the language of Note 7 itself does not expressly require the installation of permanent trench breakers at both sides of every wetland with sufficient clarity to permit criminal enforcement.

In addition to the arguments already cited above, defendants assert that Note 7 provides no guidance as to when, in terms of the construction process, the breakers would be used. Although the government contends that Note 7 refers to permanent trench breakers or plugs installed at wetland edges following pipe installation, defendants assert that the language of Note 7 and its drafting history are inconsistent with the government's position. Rather, defendants claim that Note 7 probably reflects Iroquois' intent to use temporary ditch breakers or plugs made of sandbags or other materials, which Iroquois placed in the open trench prior to pipe installation, to prevent changes in the natural drainage patterns. Moreover, defendants assert that the drawings themselves support the view that Note 7 refers to temporary breakers. In this regard, defendants note that the drawings are pictorial depictions of construction methods that Iroquois planned to use during construction in wetlands and with few exceptions the drawings and their notes refer to temporary measures to be used while construction operations were on-going.

In response to defendants' arguments, the government contends that the requirement contained in Note 7 is not unconstitutionally vague, either on its face or as applied to defendants. Furthermore, the government asserts that the permit application makes it absolutely clear that Iroquois proposed the wetland breaker obligation and in no way limited it to temporary installation during construction, to instances where water was flowing in the trench, or to perched wetlands. As an example, the government directs the court's attention to the section of the permit application which addresses dredged and fill material. In this section, Iroquois addressed how it intended to respond to potential impacts from dredge and fill activities. *See*

Defendants' Joint Exhibits at Vol. I, Tab 6 at 4–1. In particular, Iroquois stated that "[f]ollowing construction activities, ... trench breakers will be used to ensure that the trench does not drain the wetland." *See id.* at Vol. I, Tab 6 at 4–19. Moreover, the government notes that in the permit application section entitled "Detailed Description of Proposed Activity," defendants included the drawings which they now claim are ambiguous.

As further support for its position, the government relies upon an under-oath interview of Craig Ferris, an unindicted co-conspirator and co-owner of defendant Phenix Environmental. During that interview the prosecution asked Mr. Ferris the following question: "Okay. So if breakers were not placed at the edges—at both edges of each wetland, that would be in violation of the Corps of Engineers permit?" To which Mr. Ferris responded, "Correct." *See* Government's Memorandum of Law in Response to Defendants' Motion to Dismiss Counts 14–19 at 13. The government submits that this answer is an admission by Mr. Ferris at least as to Defendant Phenix Environmental, Inc. with respect to the matters at issue in these counts.

The government also relies upon a July 24, 1991 "Inter-office Memorandum" from Ed Karpiel addressed to "All Spread Supervisors" regarding "Ditch Breaker Requirements." This memo states, in pertinent part, that "[b]reakers should continue to be installed as directed by the Company Inspector for all slopes over 5 percent or 3 degrees where seeps, run-offs, swales could cause water piping in the trench. Also, breakers are specified at both sides of wetlands[,] creeks, streams[,] drainage swales, etc...." *See id.* at 14 and Exhibit 1 attached thereto. This memo also indicates that it was placed in a file entitled "Non–Compliance, Contract Clarification." *See id.*

Finally, the government directs the court's attention to a memorandum authored by Nick Yost, the attorney who represented Iroquois during the permitting and certification process, dated January 11, 1991, to Joseph Seebode, the Chief of Regulatory Compliance for the Corps' New York District. In this

memo, Mr. Yost states that "[w]e understand that an issue arose as to whether Iroquois is bound to use trench plugs to prevent drainage around the pipe at the edge of wetlands. Iroquois included such trench plugs in documents filed with agencies and is prepared to commit to their use." *See* Government's Memorandum of Law, Exhibit 4 attached thereto at 2.

 Whether a permit is unconstitutionally vague is a question of law. " 'A defendant is deemed to have fair notice of an offense if a reasonable person of ordinary intelligence would understand that his or her conduct is prohibited by the law in question.' " *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir.1993) (quoting *United States v. Fitzgerald*, 882 F.2d 397, 398 (9th Cir.1989)). Normally, in evaluating whether a particular statute is vague, the court looks to the common understanding of its terms. *See id.* However, if the statutory prohibition

"involves conduct of a select group of persons having specialized knowledge, and the challenged phraseology is indigenous to the idiom of that class, the standard is lowered 'and a court may uphold a statute which 'uses words or phrases having a technical or other special meaning, well enough known to enable those within its reach to correctly apply them.' "

*Weitzenhoff*, 35 F.3d at 1289 (quoting *Precious Metals Assocs., Inc. v. Commodity Futures Trading Commission*, 620 F.2d 900, 907 (1st Cir.1980) (quoting in turn *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926))).

In the present case, the court is faced with somewhat of a unique situation because the "ambiguity," if there is one, is not at the statutory level. Rather, it involves a single requirement within a permit, to which the parties ascribe different meanings. In other words, defendants do not assert, at least for purposes of this motion, that § 1319(c) is vague. That statute clearly penalizes a person who either knowingly or negligently violates "[a]ny requirement imposed ... in a permit issued under section 1344 of this title by the Secretary of the Army ..." 33 U.S.C. § 1319(c). Nor do defendants challenge the Corps' authority to issue a § 404 permit to

regulate the discharge of dredged or fill material into the navigable waters, including wetlands, of the United States. What they do challenge, however, is the meaning of the trench breaker requirement found in Note 7 of two typical construction drawings attached to the Iroquois Permit.

If the court were to conclude that Note 7 is ambiguous, it would have to apply the rule of lenity. With respect to this rule, the Supreme Court has stated that "[w]here text, structure, and history fail to establish that the Government's position is unambiguously correct—we apply the rule of lenity and resolve the ambiguity in [the defendants'] favor." *United States v. Granderson*, 511 U.S. 39, 54, 114 S.Ct. 1259, 1267, 127 L.Ed.2d 611 (1994).

The court has reviewed the text, structure and history of Note 7 and finds that the government's position is not unambiguously correct. The phrase in Note 7 that "clay plugs or ditch breakers will be installed to prevent changes in the natural drainage pattern" is open to two equally reasonable interpretations: (1) that Iroquois was required to install clay plugs or ditch breakers where needed to ensure that the wetlands would not be drained and (2) that Iroquois was required to install clay plugs or ditch breakers at both edges of every wetland crossed by the pipeline, regardless of the need to ensure that the wetlands would not be drained. Moreover, the regulatory history of the Iroquois Permit does not erase this ambiguity. Although some parts of the regulatory history lead to the reasonable conclusion that Iroquois was required to install the clay plugs or ditch breakers only if needed, other sections of this same history lead to the equally reasonable conclusion that Iroquois was required to install the clay plugs or ditch breakers at both edges of each wetland crossed by the pipeline, regardless of need, as a prophylactic measure.

Given this ambiguity, the court is left with no choice but to apply the rule of lenity and resolve the ambiguity in defendants' favor. *See Granderson*, 511 U.S. at 54, 114 S.Ct. at 1267. Mindful that this situation might arise, the court inquired of both the government and defendants at oral argument what the

outcome would be if the court were to rely upon the rule of lenity. Both sides agreed that the result would be dismissal of Counts 14–19. The court concurs with this conclusion. Accordingly, the court holds that the rule of lenity provides an alternative basis for granting defendants' motion to dismiss Counts 14–19 of the Indictment.[9]

### III. Motion to Dismiss Counts 2–13 and 26–31 of the Indictment for Lack of Authority to Enforce Criminally Provisions of Appendices C and D to the FEIS

#### A. Introduction

Counts 2–13 and 26–31 are based solely upon alleged violations of technical construction guidelines and procedures that appear in Appendices C and D of the FEIS, a document promulgated and prepared by FERC pursuant to its authority under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. The gravamen of defendants' motion to dismiss these counts is that they seek to hold defendants criminally liable under the CWA for certain conduct relating to the construction of the Iroquois natural gas pipeline which is neither proscribed by the CWA nor by any legal requirement appearing in the Iroquois Permit.

The government opposes this motion in its entirety, arguing that Special Condition 10 of the Iroquois Permit, which directs compliance with Appendices C and D, is a proper exercise of the District Engineer's authority to place conditions or limitations on a permit issued pursuant to § 404. Therefore, argues the government, a violation of Special Condition 10 provides a proper basis for Counts 2–13 and 26–31.

#### B. Analysis

The basis for defendants' contention that the provisions in Appendices C and D cannot be criminally enforced is two-fold. First of all, they assert that Special Condition 10 of the Iroquois Permit does not incorporate the provisions of Appendices C and D by reference and, therefore, these provisions are not requirements of the Iroquois Permit. Secondly, defendants argue that even if Special Condition 10 does incorporate Appendices C and D by reference, such incorporated provisions cannot serve as a basis for criminal prosecution under the CWA because it was FERC, not the Corps, that promulgated the FEIS, including Appendices C and D, pursuant to NEPA; and Congress did not authorize FERC to define criminal conduct for purposes of the CWA.

Special Condition 10 provides that Iroquois [s]hall implement the "Stream and Wetland Construction and Mitigation Procedures" contained in Appendix D of the Final Environmental Impact Statement (FEIS) when constructing across flowing streams, rivers and wetlands; and shall implement the "Erosion Control, Revegetation, and Maintenance Plan" contained in Appendix C of the FEIS for all other disturbed areas. Any deviation from these procedures must be coordinated and approved by the Corps of Engineers office reference [sic] in Special Condition a [sic] at least 2 weeks prior to implementation. Any deviation that is determined to be substantial cannot be implemented without the prior *written* approval of the Corps of Engineers, in consultation with other interested state and federal agencies as appropriate.

*See* Defendants' Memorandum of Law in Support of Motion to Dismiss Counts 2–13 and 26–31, Exhibit 2 attached thereto, at 26.

Even a cursory review of Special Condition 10 indicates that it mandates that defendants implement the provisions of Appendices C and D of the FEIS. Nonetheless, defendants expend a great deal of time and effort attempting to circumvent the plain language of this condition by arguing that its wording bears no resemblance to that usually employed to effect a legal incorporation by reference. Moreover, they assert that many of the provisions of Appendices C and D are non-sensical, ultra vires, or so trivial that no reasonable government official would regard

---

**9.** The court also notes that many of the documents and statements upon which both sides rely to support their respective positions with respect to the issue of Note 7's meaning further support the court's earlier conclusion that Note 7 regulates an activity unrelated to the discharge of dredged or fill material into the navigable waters of the United States.

non-compliance as an appropriate subject for criminal prosecution.

The court disagrees with defendants on both counts. First of all, there is no magic language of which the court is aware that is necessary to effect an incorporation by reference. Moreover, having reviewed Special Condition 10 the court is at a loss to discern how the Corps could have made its intent that this condition required Iroquois to implement the provisions of Appendices C and D any clearer. Secondly, although defendants may be correct that some of the provisions contained in Appendices C and D are trivial, non-sensical, or ultra vires, that does not render the remaining provisions unenforceable. In other words, the court is only concerned with the counts charged in the Indictment and the specific provisions of these appendices upon which the government bases its criminal prosecution of defendants. The other provisions of Appendices C and D are of no concern to this court.

At oral argument and in its Bill of Particulars, the government identified the specific provisions of Appendices C and D that form the basis for Counts 2–13 and 26–31. With regard to Appendix D, the government asserts that it is relying upon IV(A), IV(E), IV(F) and V(B)(1). With regard to Appendix C, the government asserts that it is relying upon I(A)(3), II(A)(3), I(B)(1), I(B)(2), I(B)(3), II(B)(1), I(D)(6), I(D)(7), I(D)(8), II(C)(6), II(C)(8), II(C)(9), II(C)(10), II(C)(11), I(G)(1), II(F)(1), I(E)(2), I(E)(3), II(D)(2), II(D)(3), I(E)(1), II(D)(1), I(F)(3), and II(E)(2). It is these provisions, and only these provisions, which are the focus of the court's inquiry. As long as these provisions pertain to the discharge of dredged or fill material into navigable waters at specified disposal sites, they are within the Corps' jurisdiction to promulgate under § 404 and thus would constitute valid permit requirements, knowing or negligent violation of which would subject defendants to criminal prosecution under the CWA.

As the court noted in part II *supra*, § 404 limits the Corps' jurisdiction under the CWA. The court will not repeat the arguments contained in part II, but suffice it to say that in order for the provisions of Appendices C and D to constitute valid requirements of the Iroquois Permit they must pertain directly to a discharge of dredged or fill material into the navigable waters of the United States. Whether they meet this criteria will be addressed in Part IV *infra*. The issue which the court must address to resolve this motion, however, is whether the Corps promulgated these provisions or whether it improperly delegated its authority to define criminal conduct to FERC.

■ Defendants argue that because Appendices C and D are part of the FEIS which FERC promulgated, they cannot form the basis for a criminal prosecution under the CWA. The basis for this proposition lies in defendants' contention that by adopting wholesale the provisions of Appendices C and D the Corps subdelegated its authority to define criminal conduct to FERC. To the contrary, the government asserts that it was Congress, not the Corps, which defined criminal conduct when it declared in §§ 1319(c)(1)(A) and (c)(2)(A) that it was unlawful, negligently or knowingly, to violate conditions or limitations contained in a § 404 permit.

■ The court begins its analysis with the well-established principle that Congress may delegate to an agency the authority to define by regulation what conduct will be criminal, "[s]o long as Congress makes the violation of regulations a criminal offense and fixes the punishment, and the regulations 'confin[e] themselves within the field covered by the statute.'" *Loving v. United States,* 517 U.S. 748, 116 S.Ct. 1737, 1748, 135 L.Ed.2d 36 (1996) (quoting *United States v. Grimaud,* 220 U.S. 506, 518, 31 S.Ct. 480, 483, 55 L.Ed. 563 (1911)) (other citation omitted).

■ Despite the government's assertion to the contrary, Congress did not define the criminal conduct with which defendants are being charged. Instead, it delegated this authority to the Corps. Congress did so by promulgating § 1319 which provides, in pertinent part, that any person who negligently or knowingly violates "[a]ny requirement ... in a permit issued under section 1344 of this title ... shall be punished ..." 33 U.S.C.

§ 1319(c)(1)(A), (c)(2)(A). Section 1319 also fixes the punishment for both negligent and knowing violations of requirements in a § 404 permit such as the Iroquois Permit. *See id.* Finally, as the court noted in part II *supra,* the Corps' regulations do confine themselves to the field covered by the statute; i.e., the discharge of dredged or fill material into the navigable waters of the United States.[10] Thus, the court concludes that Congress' delegation to the Corps of the authority to define criminal conduct under the CWA is appropriate and is sufficient to supply the notice to defendants that the Constitution requires. *See Loving,* 116 S.Ct. at 1748.

This conclusion, however, does not end the court's inquiry. Next, the court must determine whether the Corps improperly subdelegated this authority to FERC. Defendants' argument that the Corps did subdelegate this authority to FERC is based on the fact that it was FERC which promulgated the FEIS, of which Appendices C and D are a part, and that the Corps had no input in the development of this document other than to comment on its provisions. Although it is true that FERC was the lead agency on this project and promulgated the FEIS and its appendices, it does not necessarily follow that the Corps' incorporation of these appendices in Special Condition 10 constitutes the subdelegation of its authority to define criminal conduct. The FEIS and the Iroquois Permit are two separate documents, and the Corps could have chosen not to include any part of the FEIS into the permit it issued. However, as the Corps' ROD makes clear, the Corps carefully reviewed the FEIS as well as other documents as part of its duty to ensure that any permit it issued would comply with § 404(b)(1) guidelines before deciding to incorporate certain provisions in the Iroquois Permit.

For example, in its discussion of "Shore Erosion & Accretion," the ROD provides that

[u]navoidable impacts [on accretion], such as use of staging areas, would be mitigated

by a series of compensatory actions which would be required through special conditions which would be contained in a Department of the Army permit.... %ADA]ppendices C and D of Volume I of the FEIS specify procedures to be followed to control erosion and to minimize impacts to streams and wetlands in this regard, and Special Condition 5 of the FERC license requires IGTS to implement these procedures.

*See* Defendants' Memorandum of Law in Support of Motion to Dismiss Counts 2–13 and 20–31, Exhibit 2 attached thereto, at 20–21 (emphasis added).

The ROD goes on to note that

[w]ith regard to consideration of alternatives [to the proposal] as required by the Section 404(b)(1) of the Clean Water Act Guidelines, the Corps of Engineers believes IGTS has reasonably demonstrated that there are no practicable alternatives to the proposed discharge of backfill material which would be less environmentally damaging, and that further, upon compliance with a series of special conditions aimed at minimizing environmental impacts, the proposed discharge complies with the Guidelines. **Numerous special conditions have been included in the FERC license and other governmental approvals, and will be included in a [Department of the Army] permit,** in order to mitigate adverse environmental impacts which cannot be avoided.

*See id.* at 22–23 (emphasis added).

This discussion in the ROD belies defendants' contention that the Corps subdelegated its authority to define criminal conduct to FERC. Certainly, the Corps relied upon FERC's work and analysis, but the Corps itself determined what part of that analysis was applicable and which provisions of the FEIS it would include in the Iroquois Permit. The Corps was not required to reinvent the wheel or meticulously spell out each pro-

---

**10.** Lest the parties be confused, the court's conclusion that the Corps' regulations confine themselves to the field covered by the statute does not necessarily result in a finding that the particular provisions of Appendices C and D, or any other requirement of the Iroquois Permit, likewise confine themselves to that field. As noted above, the court will address this latter issue in part IV *infra.*

vision of Appendices C and D as a separate requirement of the Iroquois Permit. Instead, the Corps did, what was well within its authority to do once it determined that the provisions of Appendices C and D would be included in the Iroquois Permit: it incorporated these appendices into Special Condition 10, thus making them requirements of the Iroquois Permit. *Cf. Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 642 (5th Cir. 1983) (An agency is not required "to do it alone" in reviewing environmental impacts of projects. An agency is authorized to consider or even adopt an outside report so long as the agency independently verifies it).

■■■ Defendants also argue that because FERC promulgated the FEIS pursuant to its authority under NEPA, the provisions of this document cannot serve as a basis for a criminal prosecution under the CWA. The court has no quarrel with defendants' assertions per se. The court, however, disagrees with the conclusions defendants reach based upon these assertions.

There is no dispute that the primary function of an environmental impact statement under NEPA is "'to insure a fully informed and well-considered decision[.]'" *Sierra Club v. United States Army Corps of Eng'rs,* 701 F.2d 1011, 1029 (2d Cir.1983) (quoting *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980) (quoting in turn *Vermont Yankee,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978))) (other citation omitted). Nor is there any dispute that Congress has made no provision in NEPA for criminal, or even civil, enforcement of any recommendations contained in a FEIS. *See* 42 U.S.C. §§ 4331–4347. However, as the court noted in part II *supra,* although it is appropriate for the Corps to consider many factors subject to a NEPA-mandated review, it may only impose conditions in a § 404 permit which directly relate to the discharge of dredged or fill material into the navigable waters of the United States. *See NRDC II,* 859 F.2d at 169–70. Thus, defendants' contention that simply because the provisions of Appendices C and D were the result of a NEPA-mandated review they are unenforceable is erroneous. As long as the Corps independently reviews their contents, the genesis of these provisions is irrelevant. *See Save Our Wetlands,* 711 F.2d at 642. It is the conduct which they regulate which is determinative of the issue of whether they can serve as a basis for a criminal prosecution under the CWA.

■■■ Finally, defendants assert that the Corps' own regulations do not allow incorporation such as that found in Special Condition 10 to serve as a basis for criminal prosecution. To support this argument, defendants cite 33 C.F.R. § 325.4(a)(2) which provides that the "[d]istrict engineer may take into account the existence of controls imposed under other federal, state, or local programs which would achieve the objective of the desired condition, ... in determining whether a proposal complies with the 404(b)(1) guidelines, ... and is not contrary to the public interest." 33 C.F.R. § 325.4(a)(2). This regulation goes on to state that when taking into account such controls, "[t]he Department of Army permit will be conditioned to state that material changes in, or a failure to implement and enforce such program ..., will be grounds for modifying, suspending, or revoking the permit." *Id.* Defendants interpret this language to mean that modification, suspension or revocation of a permit are the only means available to the Corps to sanction an entity which does not implement and enforce the provisions of a document such as Appendices C and D. The government, of course, interprets this regulation differently. According to its interpretation, although § 325.4(a)(2) requires the District Engineer to warn the permittee that, because outside controls were considered and factored into his review, a failure to comply with such controls is grounds to suspend, modify, or revoke the permit, this regulation does not prohibit the Corps from adopting parts of documents originally drafted by another agency and making them part of a permit condition which then can be civilly or criminally enforced.

The court concludes that defendants' interpretation of § 325.4(a)(2) as it relates to Appendices C and D is unsupportable. With respect to the existence of controls imposed by other federal agencies which the Corps

chose not to include as requirements of the Iroquois Permit, § 325.4(a)(2) clearly limits the Corps' authority to sanction an entity. This same conclusion, however, does not apply to the provisions of Appendices C and D which the Corps incorporated into Special Condition 10 and upon which the government relies as a basis for Counts 2–13 and 26–31. These provisions, assuming they directly relate to the discharge of dredged or fill material into navigable waters, are legitimate requirements of the Iroquois Permit and, thus, are criminally enforceable under § 1319 of the CWA.

## C. Conclusion

For all the reasons stated above, the court concludes that Special Condition 10 legitimately incorporates by reference Appendices C and D of the FEIS. As such, the provisions of these appendices upon which the government relies as a basis for Counts 2–13 and 26–31 constitute requirements of the Iroquois Permit. Furthermore, the court concludes that the fact that FERC promulgated these appendices pursuant to NEPA does not render them unenforceable because it is clear from the ROD that the Corps independently reviewed them before deciding which ones to include in the Iroquois Permit. Accordingly, the court denies defendants' motion to dismiss Counts 2–13 and 26–31.

## IV. *Motion to Dismiss Counts 2–13 and 20–31 of the Indictment as Beyond the Substantive Regulatory Authority of the Corps of Engineers under § 404 of the Clean Water Act*

### A. Introduction

Defendants move to dismiss Counts 2–13 and 20–31 on the grounds that the Corps of Engineers lacked the substantive authority under § 404 to impose the alleged permit "requirements" on which Counts 2–13 and 20–31 are predicated.[11] The government opposes this motion in its entirety.

11. For purposes of this motion, the court will assume that the Iroquois Permit was not procedurally defective and that Special Condition 10 effectively made each of the Appendix C and D

### B. Summary of Arguments

Defendants assert that the Corps' permitting authority is limited by the express terms of § 404 to the regulation of discharges of dredged or fill material and does not extend to other activities of a permittee in or affecting waterbodies or wetlands. According to defendants, the Corps recognized this limitation at the time it issued the Iroquois Permit by identifying in its ROD the only two Iroquois construction activities which were within the scope of the Corps' authority under § 404: "[t]he backfilling of trenches excavated in waterways and wetland areas, and the placement of any temporary fills in waters of the United States necessary to support construction activities." *See* Defendants' Memorandum of Law in Support of Motion to Dismiss Counts 2–13 and 20–31, Exhibit 2 attached thereto, at 15.

Despite the recognition of these statutory limitations, defendants assert that under the Corps' regulations the New York District Engineer determined that he was entitled to impose any permit condition he judged to be in "the public interest," without regard to the authorizing statute. Thus, according to defendants, the New York District Engineer imposed broad-ranging conditions, unrelated to the permitted discharges, or Iroquois' pipeline construction activities, including wholesale incorporation of FERC's recommended environmental mitigation measures contained in Appendices C and D of the FEIS. Defendants contend that this was clearly beyond the Corps' statutory authority to regulate discharges of dredged or fill material into the navigable waters of the United States at specified disposal sites. Moreover, defendants assert that nothing in § 404 empowers a Corps District Engineer to impose criminally enforceable permit "requirements" on nondischarge activities of a permittee under the amorphous standard of the "public interest." Therefore, argue defendants, since Counts 2–13 and 20–31 are based, in whole or in part, on permit provisions unauthorized by § 404 and unenforceable in a

provisions upon which the government has indicated it is relying separately enforceable permit requirements.

CWA prosecution, the court should dismiss these counts.

In response, the government asserts that § 404(b)(1) requires that the Corps base its permit decisions on guidelines (" § 404(b)(1) guidelines") jointly drafted by the Corps and the EPA. *See* 33 U.S.C. § 1344(b)(1). According to the government, in determining whether Iroquois' discharge of dredged or fill material complied with these guidelines and the requirements of the Corps' regulations, 33 C.F.R. Parts 320–330, the District Engineer found that the proposed discharges would be in compliance provided that several special conditions were included to minimize the adverse impact on the aquatic ecosystem. In other words, the District Engineer determined that certain special conditions, addressing potential impacts on the physical and chemical characteristics of the aquatic ecosystem, had to be included in the permit, and adhered to, in order for the proposed discharges to comply with the § 404(b)(1) guidelines.

The government asserts that as a result of this determination, the District Engineer included several special permit conditions in the Iroquois Permit to minimize the adverse impacts of the proposed discharges in compliance with the § 404(b) guidelines and 33 C.F.R. Parts 320–330. The government contends that it is these conditions, which specifically relate to the discharge of dredged or fill material and its secondary effects, upon which Counts 2–13 and 20–31 are based.

Moreover, the government claims that, despite defendants' arguments to the contrary, the Indictment is not based upon any attempted regulation of non-point source discharges or on any activities unrelated to the discharge of dredged or fill material. Therefore, because the permit conditions that form the basis for Counts 2–13 and 20–31 are not only within the Corps' authority but mandated by the CWA and the validly promulgated regulations thereunder, the government asserts that these counts should not be dismissed.

## C. Analysis

The court will not repeat verbatim the analysis set forth in part II *supra* concerning the scope of the Corp's authority under § 404. To summarize, pursuant to the relevant case law, the § 404(b)(1) guidelines, and the Corps' own regulations, the Corps has the authority to include as requirements of a § 404 permit only those provisions which directly relate to the discharge of dredged or fill material into the navigable waters of the United States. With these legal standards in mind, all that is left for the court to decide in order to resolve this motion is whether the requirements which form the basis of Counts 2–13 and 20–31 meet these standards.

As noted in part III *supra,* at oral argument and in its Bill of Particulars, the government identified the provisions of Appendices C and D upon which it relies as a basis for Counts 2–13 and 26–31. The government also identified those provisions which pertain to Counts 20–25: Appendix D, I(F)(3) and II(E)(2). In addition, the government stated that it is relying upon Special Condition 13 of the Iroquois Permit as a basis for these latter counts.[12]

With respect to Counts 2–7, the government states that it is relying upon the following provisions: Appendix D, I(A)(3); I(B)(1), I(B)(2), I(B)(3); I(D)(6), I(D)(7), I(D)(8); I(G)(1); II(A)(3); II(B)(1); II(C)(6), II(C)(8), II(C)(9), II(C)(10), II(C)(11); and II(F)(1). Of these sixteen provisions, defendants contend that eleven of them, by their plain terms, do not regulate the discharge of fill material into waters of the United States. Rather, defendants assert that the only plausible purpose for these eleven provisions is to minimize the adverse environmental impacts of pipeline construction activity generally. As to the remaining five provisions of Appendix D, I(D)(6), I(D)(7), I(D)(8), II(C)(10) and II(C)(11), defendants concede that they may relate to the identified discharges.

---

**12.** Special Condition 13 provides that "[t]he permittee shall remove in their entirety, any cofferdams, dewatering devices, log roads or other temporary structures or fills placed within the waters of the United States to facilitate pipeline installation, immediately upon cessation of the construction activity in that particular area." *See* Defendants' Memorandum of Law in Support of Motion to Dismiss Counts 2–13 and 26–31, Exhibit 2 at Special Condition 13.

With respect to Counts 8–13, the government states that it is relying upon the following provisions: Appendix C, V(B)(1); Appendix D, I(E)(1), I(E)(2), I(E)(3), II(D)(1), II(D)(2), and II(D)(3). Defendants assert that none of these provisions regulate a discharge of dredged or fill material. In this regard, they contend that Appendix C, V(B)(1) regulates upland surface run-off into wetlands and waterways, while the other provisions, except for Appendix D, I(E)(3), require the installation, inspection and repair of sediment filter devices at the edges of streams or wetlands and the installation of slope breakers at the base of all slopes adjacent to wetlands. According to defendants, upland surface run-off is not from a point source, does not involve dredged or fill material, and has been declared clearly outside the CWA jurisdiction of the Corps. With respect to Appendix D, I(E)(3), defendants claim that this provision, rather than regulating the discharge of dredged or fill material, involves draining of water of the United States, an activity which is not subject to Corps' regulation under § 404.

With respect to Counts 20–25, the government states that it is relying upon the following provisions: Special Condition 13 and Appendix D, I(F)(3) and II(E)(2). Defendants concede that Special Condition 13 which regulates the removal of temporary fills that were placed in waters of the United States to support construction activity was within the Corps' jurisdiction to impose. However, they contend that Appendix D, I(F)(3) and II(E)(2) do not regulate the discharge of dredged or fill material and cannot form the basis for a CWA prosecution. Both of these provisions concern the restoration of stripped topsoil and the revegetation of the banks of perennial streams and wetlands.

Finally, with respect to Counts 26–31, the government states that it is relying upon the following provisions: Appendix C, IV(A), IV(E), and IV(F). Defendants claim that these provisions, in fact all of Appendix C, apply only to activities on dry land and do not apply to activities in flowing streams, rivers and wetlands. Therefore, none of these provisions can possibly regulate discharges of any kind into navigable waters at specified disposal sites. In addition, defendants contend that besides being outside the Corps' territorial jurisdiction these three provisions have nothing to do with the discharge of dredged or fill material. Appendix C, IV(F) concerns the construction of permanent slope breakers. According to defendants, these slope breakers are another form of erosion control, are installed even where there is not waterbody at the base of the slope and have absolutely nothing to do with the discharge of dredged or fill material into the navigable waters of the United States. Appendix C, IV(E) concerns the removal of construction debris from and the grading of the right-of-way, which, defendants contend, in no way regulates any discharge. Finally, Appendix C, IV(A) concerns the timing for the completion of final clean-up and permanent erosion control measures and does not regulate the discharge of dredged or fill material.

Unfortunately, the government does not respond individually to defendants' arguments concerning the specific provisions upon which the government relies as a basis for the instant counts. The government, instead, makes the generalized statement that "[t]he provisions of Appendices C and D . . . , upon which this prosecution rests, are directly related to the minimization of direct and secondary impacts caused by the discharge of fill into waters of the United States; as required by the 404(b)(1) guidelines." *See* Government's Memorandum of Law in Response to Defendants' Motion to Dismiss Counts 2–13 and 20–31 at 11–12. The government explains further that "[t]he provisions requiring the placement and maintenance of mulch, 'slope breakers' and sediment filter control devices were included to minimize the erosion of fill material into surrounding areas, as well as to reduce the overall effect of the discharge itself." *Id.* at 12. With respect to the provisions relating to staging areas, additional right-of-way, spoil pile placement control, time windows for construction, crossing procedures, trench dewatering and wetland draining or fill placement, the government asserts that they were "[d]esigned to limit erosion, water circulation change and fluctuation and turbidity caused by the discharging of dredged or fill

material and the adverse environmental impacts to the aquatic ecosystem associated with those conditions." *Id.* at 13. Finally, the government contends that "[t]he purpose behind requiring immediate removal of fill and other structures, such as coffer dams and log roads, was to diminish the effect on the substrate of the aquatic ecosystem, which underlies the waters of the United States, and to prevent as much loss of the original environmental characteristics and values as possible." *Id.*

 While the government's goals for including these provisions in the Iroquois Permit are laudable, that does not change the fact that in order to be enforceable, these provisions must be directly related to the discharge of dredged or fill material into the navigable waters of the United States. The government may not rely upon its "public interest" review or its NEPA mandate to expand its jurisdiction under § 404. As the court stated in *Natural Resources Defense Council v. United States Envtl. Protection Agency*, 822 F.2d 104 (D.C.Cir.1987) ("*NRDC I*"), although NEPA "[r]equires a specific decisionmaking process, broadening the range of factors that an agency must consider to encompass environmental effects, even those over which the agency has no control, ... NEPA's mandate, ..., stops at this requirement; NEPA does not require that certain outcomes be reached as a result of the evaluation." *Id.* at 129 (citation omitted). The court went on to explain that "NEPA, as a procedural device, does not work a broadening of the agency's substantive powers.... Whatever action the agency chooses to take must, ..., be within its province in the first instance." *Id.* (citations omitted).

In the present case, the government has failed to demonstrate that many of the provisions upon which it relies as a basis for Counts 2–13 and 20–31 are directly related to the discharges at issue. In fact, the government does not even attempt, with any degree of specificity, to defend many of the provisions defendants challenge. Its generalized arguments with respect to the purpose of these provisions and its reliance upon the § 404(b)(1) guidelines, its NEPA mandate, and its own regulations are, as noted in part

II *supra*, insufficient to overcome the unambiguous language of § 404 which limits the Corps' jurisdiction under the CWA.

This conclusion, however, does not require the court to grant defendants' motion in its entirety. In this regard, with respect to Counts 2–7, the court denies defendants' motion to dismiss these counts. However, the court hereby limits the government to reliance upon Appendix D, I(D)(6), I(D)(7), I(D)(8), II(C)(10) and II(C)(11) as a basis for these counts. In other words, the government may not rely upon Appendix D, I(A)(3), II(A)(3), I(B)(1), I(B)(2), I(B)(3), II(B)(1), II(C)(6), II(C)(8), II(C)(9), I(G)(1), or II(F)(1) as a basis for its prosecution of defendants. Likewise, the court hereby orders the government to amend its Bill of Particulars to conform to this decision.

With respect to Counts 8–13, the court finds that none of the provisions of Appendices C and D upon which the government relies regulate the discharge of dredged or fill material into the navigable waters of the United States. Accordingly, the court grants defendants' motion to dismiss Counts 8–13 of the Indictment.

 With respect to Counts 20–25, the court denies defendants' motion to dismiss these counts. Nonetheless, the court concludes that the government may not rely upon Appendices I(F)(3) and II(E)(2) as a basis for these counts. However, the government may rely on Special Condition 13 as a basis for its prosecution of defendants. Therefore, the court hereby orders the government to amend its Bill of Particulars to conform to this decision.

 Finally, with respect to Counts 26–31, the court finds that Appendix C, IV(A), IV(E), and IV(F) are not related to the discharge of dredged or fill material into the navigable waters of the United States. Therefore, they may not serve as a basis for the government's prosecution of defendants. Accordingly, the court grants defendants' motion to dismiss Counts 26–31 of the Indictment.

## CONCLUSION

The following summarizes the court's resolution of defendants' motions:

"Motion # 1": The court **GRANTS** defendants' motion to dismiss Counts 2–31 of the Indictment for unlawful delegation of permitting authority and hereby strikes any claims in Count 1 of the Indictment which are based upon violations of the Iroquois Permit.

Although the court's resolution of "Motion # 1" renders unnecessary the court's consideration of the remaining motions, the court, nonetheless, considered them and reached the following results: [13]

"Motion # 2": The court **GRANTS** defendants' motion to dismiss Counts 14–19 of the Indictment.

"Motion # 3": The court **DENIES** defendants' motion to dismiss Counts 2–13 and 26–31 of the Indictment to the extent that it is based upon defendants' contention that Appendices C and D were not properly incorporated as requirements of the Iroquois Permit.

"Motion # 4": (a) The court **DENIES** defendants' motion to dismiss Counts 2–7 of the Indictment. However, for purposes of its prosecution of defendants under these counts, the government may rely only upon the following provisions of Appendix D: I(D)(6), I(D)(7), I(D)(8), II(C)(10) and II(C)(11). Furthermore, the court **ORDERS** the government to amend its Bill of Particulars to conform to this decision.

(b) The court **GRANTS** defendants' motion to dismiss Counts 8–13 of the Indictment.

(c) The court **DENIES** defendants' motion to dismiss Counts 20–25 of the Indictment. However, for purposes of its prosecution of defendants under these counts, the government may rely only upon Special Condition 13 of the Iroquois Permit. Furthermore, the court **ORDERS** the government to amend its Bill of Particulars to conform to this decision.

(d) The court **GRANTS** defendants' motion to dismiss Counts 26–31 of the Indictment.

**IT IS SO ORDERED.**

13. For purposes of these motions, the court assumed that the Iroquois Permit was validly issued. Furthermore, with respect to "Motion # 4," the court assumed that Appendices C and D were properly incorporated into Special Condition 10 of the Iroquois Permit and thus became requirements of that permit.